**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Miqueas ACOSTA, Appellee.**

Superior Court of Pennsylvania.

Argued June 27, 2002.
Filed Jan. 15, 2003.

John S. Benson, Asst. Dist. Atty., Doylestown, for Com., appellant.

Michael K. Parlow, Bensalem, for appellee.

Before: DEL SOLE., P.J., FORD ELLIOTT, JOYCE, STEVENS, MUSMANNO, ORIE MELVIN, LALLY-GREEN, KLEIN and BENDER, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 The Commonwealth of Pennsylvania appeals from the Order of the trial court, which granted the suppression Motion filed on behalf of defendant Miqueas Acosta ("Acosta"). We affirm.

¶ 2 In its Opinion dated February 15, 2001, the suppression court set forth its factual findings as follows:

On June 16, 2000, Officer John Monaghan was on duty in Bensalem Township, Bucks County, Pennsylvania. Officer Monaghan was driving southbound on U.S. Route 1 in a marked police vehicle when he saw a red, 1992 Ford minivan driven by [Acosta]. As Officer Monaghan began to pass the minivan, he noticed that [Acosta] changed the manner in which he was driving by straightening up, putting both hands on the steering wheel and refusing to look at the officer.

After Officer Monaghan passed [Acosta], he radioed the New York tag of the minivan into police headquarters in order to determine whether the tag was valid. Police headquarters informed him that the license plate for [Acosta's] vehicle had been suspended. Officer Monaghan then activated his car's overhead lights and pulled [Acosta] over to the right-hand side of the road.

Officer Monaghan approached the minivan and asked the sole occupant for his driver's license, registration and insurance information. [Acosta] gave the officer a valid registration and insurance card and responded that he did not have his driver's license. When asked for any form of identification, [Acosta] presented a BJ's Wholesale Club card, displaying his picture and name.

When the officer informed [Acosta] that the name on the ID did not match the name on the registration and insurance card, [Acosta] stated that his brother owned the vehicle. [Acosta] also orally provided the officer with two conflicting dates of birth, and could not produce any identification reflecting his date of birth. When Officer Monaghan asked him whether he was licensed, [Acosta] said he had a Minnesota driver's license.

Officer Monaghan went back to his patrol car and called in the information regarding [Acosta's] name and the two dates of birth. The officer was unable to obtain any licensing information for [Acosta]. However, he did ascertain that a subject with a different first name and the same last name was wanted in Wisconsin for writing bad checks.[FN] The information Officer Monaghan received also included a general physical description of the wanted subject, which was fairly similar to that of [Acosta].

[FN] Further investigation revealed that [Acosta] was not the subject wanted in Wisconsin.

Upon receiving this information, Officer Monaghan radioed for assistance. He then approached the minivan and ordered [Acosta] to leave his vehicle. [Acosta] complied without incident. Officer Monaghan led [Acosta] to the rear of the minivan along the curb line of the highway. He repeated the questions he had asked previously regarding licensure and ownership of the vehicle. Officer Monaghan also asked additional questions which revealed that [Acosta] was traveling from New York to take the minivan to someone in Philadelphia. At some point during his conversation, Officer Dennis Hart arrived on the

scene in full uniform and in a marked patrol car.

Officer Monaghan then informed [Acosta] that the police were having trouble with drug trafficking on that highway. He asked [Acosta] whether he had any weapons or narcotics in the vehicle. When [Acosta] said "no," Officer Monaghan asked [Acosta] whether he would allow him to search the vehicle.

Although [Acosta] acquiesced in the officer's request, that request was made while the officer retained the registration, insurance card, and the ID card. The officer never indicated in any way that [Acosta] was free to leave before he requested consent. The officer acknowledged that he was not certain whether he would have permitted [Acosta] to leave the scene had he attempted to do so. Furthermore, the entire conversation was in English.

When the consent was requested, [Acosta] was standing in front of one of three police vehicles on the scene with their overhead lights activated. Additionally, three officers—Officer Monaghan and Officer Hart and Officer Derek Goldstein—stood next to each other in close proximity to [Acosta] when consent was requested. [Acosta] was not provided with any consent forms advising him that he had a right not to consent and he did not give a written consent. In short, he was never advised in any way that he was free not to consent to the search.

Officer Monaghan and Officer Goldstein searched [Acosta's] vehicle while Officer Hart stood directly next to [Acosta] and watched him. During this initial search, the officers did not discover any drugs.

Shortly thereafter, Officer Christine Kelliher arrived on the scene with a drug-sniffing dog named Cosmo. Up until this point in time, [Acosta] was still standing with Officer Hart along the curbside near the passenger's side of the patrol vehicle. But when the dog arrived, [Acosta] was placed in the back seat of Officer Monaghan's patrol car. Officer Monaghan stated that [Acosta] was moved for "safety reasons," although the officer testified that Cosmo was not a vicious dog, albeit it was "playful in nature" and would jump up. However, at all times, the dog was leashed and under the control of Officer Kelliher.

While [Acosta] was in the back seat of the patrol vehicle, Officer Monaghan, Officer Goldstein, Cosmo and narcotics Officer Gross searched the minivan for a second time. As a result of the second search, narcotics were found in a steel compartment built into the rear bench of the vehicle. [Acosta] was then handcuffed and advised he was under arrest. At this point, forty-five minutes had elapsed since the initial stop.

Although [Acosta] was Hispanic and later in the investigation Officer Monaghan felt the need to request that Officer Nieves advise [Acosta] of his *Miranda* rights in Spanish, nonetheless all conversations with [Acosta] at the scene were conducted in English. [Acosta] told Officer Nieves that he "knew English a little bit" but was more comfortable speaking in Spanish.

Trial Court Opinion, 2/15/01, at 1–5 (citations omitted).

¶ 3 Acosta filed a Motion to suppress the evidence seized during the search, claiming that the search violated his rights under the United States and Pennsylvania Constitutions. After a hearing, the suppression court determined that the encounter preceding the search was a valid detention based upon a violation of the Vehicle Code. *Id.* at 6. The suppression court explained

that "there was a continuous investigative detention throughout the entire time Officer Monaghan and [Acosta] were together." *Id.* On this basis, the suppression court concluded that Acosta was "seized" at the time that he gave police officers his consent to search the vehicle, and held that "the consent was not the product of an essentially free and unconstrained choice and was thus involuntary." *Id.* Accordingly, the suppression court granted Acosta's Motion to suppress the narcotics seized during the search. Thereafter, the Commonwealth filed the instant appeal pursuant to Pa.R.A.P. 311(d).[1]

¶4 On appeal, the Commonwealth claims that "[Acosta] provided [the] police [officers with] a lawful consent to search the vehicle," and on this basis, the warrantless search of the vehicle was justified. *See* Appellant's Brief on Reargument at 10. We disagree.

■■■ ¶5 When reviewing a ruling by a suppression court, our role is to determine whether the record as a whole supports the suppression court's factual findings, and whether the legal conclusions drawn from such findings are free of error. *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153 (2000). Where, as here, the Commonwealth appeals from the ruling of the suppression court, we are constrained to consider only the evidence presented by the defense and so much of the evidence for the prosecution that remains uncontradicted when read in the context of the record as a whole.[2] *Commonwealth v. Torres*, 564 Pa. 86, 95, 764 A.2d 532, 536–37 (2001).

■■■ ¶6 Pennsylvania case law recognizes three categories of interaction between police officers and citizens. The first of these is a "mere encounter," or request for information, which need not be supported by any level of suspicion, but which carries no official compulsion to stop or to respond. *Commonwealth v. Mack*, 568 Pa. 329, 341 n. 1, 796 A.2d 967, 975 n. 1 (2002) (Nigro, J. dissenting) (citing *Interest of S.J.*, 551 Pa. 637, 713 A.2d 45, 47 n. 3 (1998)). The second category, an "investigative detention," must be supported by reasonable suspicion. *Id.* This interaction "subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest." *Id.* The third category, an arrest or "custodial detention," must be supported by probable cause. *Id.* "Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Id.* (citing *Commonwealth v. Gibson*, 536 Pa. 123, 638 A.2d 203, 206 (1994)).

---

1. Rule of Appellate Procedure 311(d) provides that the Commonwealth may take an appeal as of right from an interlocutory order where it "certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d).

2. The Dissenting Opinion rejects this standard and scope of review and engages in re-weighing the evidence and adopting its own factual findings. In doing so, the Dissent ignores well-established precedent that expressly prohibits the reviewing court from engaging in such tactics. These cases hold that it is exclusively within the province of the suppression court to determine the credibility of the witnesses and the weight to be accorded their testimony. *Commonwealth v. Fitzpatrick*, 446 Pa.Super. 87, 666 A.2d 323, 325 (1996). Pursuant to these cases, as long as the facts found by the suppression court are supported by the record, this Court may not re-weigh the evidence and make its own factual findings. Here, the record supports the trial court's factual findings, and the Dissent can point to *no* fact that is not supported by the record.

¶ 7 The Fourth Amendment to the United States Constitution protects the right of persons in this country to be secure from "unreasonable searches and seizures." U.S. Const. amend. IV. "Thus, pursuant to the protections of the Fourth Amendment, before a police officer may conduct a search, he must generally obtain a warrant that is supported by probable cause and authorizes the search." *Commonwealth v. Reid*, No. 280 Capital Appeal Docket, 811 A.2d 530, 544 (2002). A search warrant is not required where a person with the proper authority "unequivocally and specifically consents to the search." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

¶ 8 Article I, section 8 of the Pennsylvania Constitution, while similar in language to the Fourth Amendment, focuses upon personal privacy interests. *See In re S.J.*, 551 Pa. 637, 648, 713 A.2d 45, 50 (1998) (Cappy, J. concurring) (distinguishing Article I, section 8 from its federal counterpart) (citing *Commonwealth v. Edmunds*, 526 Pa. 374, 390, 586 A.2d 887, 895 (1991)). Our Pennsylvania Supreme Court has "accorded greater protections to the citizens of this state under Article I, § 8 of our constitution under certain circumstances." *Commonwealth v. Cleckley*, 558 Pa. 517, 525, 738 A.2d 427, 431 (1999).

¶ 9 To establish a valid consensual search, the Commonwealth must first prove that the consent was given during a legal police interaction. *Commonwealth v. Strickler*, 563 Pa. 47, 57, 757 A.2d 884, 889 (2000). Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. *Id.* Here, Acosta does not dispute that his initial encounter with Monaghan constituted a lawful investigative detention. Thus, our analysis focuses solely upon whether Acosta's consent to

search his vehicle, given during this detention, was voluntary.

¶ 10 It is the Commonwealth's burden to prove that a defendant consented to a warrantless search. *Cleckley*, 558 Pa. at 520, 738 A.2d at 429 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Commonwealth v. Silo*, 480 Pa. 15, 389 A.2d 62 (1978)). To establish a voluntary consensual search, the Commonwealth must prove "that a consent is the product of an essentially free and unconstrained choice— not the result of duress or coercion, express or implied, or a will overborne— under the totality of the circumstances." *Mack*, 568 Pa. at 334, 796 A.2d at 970 (quoting *Strickler*, 563 Pa. at 79, 757 A.2d at 901 (2000)).

¶ 11 In this case, Monaghan requested Acosta's consent to search during a lawful investigative detention. "Situations involving a request for consent to search *following* an initial lawful detention have posed difficult analytical questions for courts[.]" *Strickler*, 563 Pa. at 60, 757 A.2d at 890 (emphasis added) (citing *Commonwealth v. Sierra*, 555 Pa. 170, 723 A.2d 644 (1999) (equally divided Court)). Our Supreme Court's decision in *Strickler*, a case involving consent given subsequent to an initial lawful detention, provides some guidance in analyzing the issue now before us.

¶ 12 In *Strickler*, a police officer observed two men apparently urinating along side a public road. *Id.* at 53, 757 A.2d at 886. After questioning the men and verifying the documentation for the vehicle and the driver, the officer returned the documents to the driver. *Id.* at 53, 757 A.2d at 887–88. At that time, the officer informed defendant Brett Strickler ("Strickler") that it was not appropriate to stop along the road and urinate on someone's property. *Id.* at 53, 757 A.2d at 888.

The officer began walking back to his cruiser when he turned and asked Strickler if there was anything illegal in the vehicle. *Id.* When Strickler stated that there was not, the officer requested Strickler's consent to search the vehicle. *Id.* The officer told Strickler that he was free to withhold his consent. *Id.* at 54, 757 A.2d at 887. Strickler consented to the search, which disclosed a marijuana smoking pipe. *Id.* at 54, 757 A.2d at 887.

¶13 After his arrest, Strickler filed a suppression motion, claiming that his consent was not voluntary. The trial court granted the motion, and the Commonwealth appealed. On appeal, this Court reversed the order of the trial court. *Commonwealth v. Strickler,* 707 A.2d 553 (Pa.Super.1997). Thereafter, the Pennsylvania Supreme Court granted allowance of appeal.

¶14 On appeal, our Supreme Court upheld the validity of Strickler's consent to the search of his vehicle, even though the officer had never expressly stated to Strickler that he was free to leave following the initial lawful detention. *Strickler,* 563 Pa. at 77, 757 A.2d at 900. The *Strickler* Court focused upon the fact that the officer's actions suggested to the defendant and his companion that they were free to leave following the initial detention, and the officer did nothing to suggest that the subsequent request for the defendant's consent to search the vehicle was to be viewed as a directive. *Id.* The Supreme Court opined: "[T]he officer did not touch Strickler or direct his movements; there is no evidence of any use of coercive language or tone by the officer. We also deem significant the arresting officer's admonition to Strickler that he was not required to consent to the search." *Id.* at 77–78, 757 A.2d at 900. Thus, the *Strickler* Court concluded that the officer's admonition that the defendant could refuse consent outweighed the officer's failure to expressly advise the defendant that he was free to leave following the initial detention. *Id.* at 78, 757 A.2d at 901.

¶15 In the instant case, based upon its factual findings and under the totality of the circumstances, the trial court determined that Acosta did not voluntarily consent to the search. At trial, Monaghan testified that when he passed Acosta, Acosta placed both hands on the steering wheel and stared straight ahead. N.T., 12/4/00, at 10. Monaghan testified that he attempted to get Acosta's attention, but this attempt solely consisted of "looking" at Acosta. *Id.* at 48–49. Monaghan's radio check of Acosta's license plate revealed that the license plate had been suspended. *Id.* at 12. At that time, Monaghan stopped Acosta's vehicle to investigate the suspended license plate. *Id.* at 13.

¶16 During the investigative detention, Acosta gave Officer Monaghan valid registration and insurance documentation for the vehicle. *Id.* at 14. Acosta, however, could not produce his driver's license and presented conflicting information regarding his identity. *Id.* at 14, 17–18. A radio check of the information provided by Acosta disclosed that a person with a different first name and the same last name was wanted in Wisconsin for writing bad checks. *Id.* at 21. The general description of the Wisconsin suspect was fairly similar to Acosta's appearance. *Id.* Based upon this information, Monaghan asked Acosta to step out of the vehicle. *Id.* at 23–24, 57.

¶17 Monaghan began to question Acosta regarding his identity, but ceased when he discovered that Acosta was traveling from New York to Philadelphia. Monaghan then began to discuss drug trafficking along U.S. Route 1. *Id.* 26–27. Monaghan told Acosta that there was drug trafficking along the route traveled by Acosta, and

asked Acosta whether he had any weapons or drugs in the vehicle. *Id.* at 27. When Acosta stated that he did not, Monaghan, while still retaining Acosta's vehicle documentation, requested Acosta's consent to search the vehicle. *Id.*

¶ 18 At the time Monaghan requested Acosta's consent, three marked police cars with flashing overhead lights and three uniformed police officers were present at the scene and stood in close proximity to Acosta.[3] *Id.* at 29, 67. Monaghan had not returned Acosta's vehicle registration, insurance card, or identification. *Id.* at 70. At the suppression hearing, Monaghan admitted that he didn't know whether he would have allowed Acosta to walk away at that point in time. *Id.* at 64.

¶ 19 During the first search, Officer Hart remained in close proximity to Acosta while Officers Monaghan and Goldstein searched Acosta's vehicle. *Id.* at 64. The officers recovered no evidence of controlled substances at that time. *Id.* at 66. When a narcotics dog arrived at the scene prior to the second search, the officers placed Acosta in a marked police vehicle with one officer standing near the passenger's door. *Id.* at 31, 40, 69. Acosta remained in the vehicle, without his documentation, during the second search of the vehicle. *Id.* at 66. It was during this search that the officers uncovered controlled substances.[4]

¶ 20 Based upon the above factual findings, the trial court found that the following coercive factors were present when Monaghan requested Acosta's consent for the search: (1) the existence of a prior, lawful detention; (2) the withholding of Acosta's vehicular documentation; (3) the presence of other officers and marked police cars with flashing lights in close proximity to Acosta; and (4) the absence of an express endpoint to the detention in the form of an admonition by the authorities that Acosta was free to leave.[5] Each of these factors, standing alone, may not be sufficient to establish coercion. However, the presence of *all* of these factors, under the totality of the circumstances, lead us to conclude that Acosta's consent was not

---

3. In a footnote, the Dissenting Opinion implies that our resolution of this case creates a "Hobson's choice" for police officers, requiring them to abandon personal safety in order to obtain a voluntary consent to search. We expressly and emphatically reject this statement. **Never** would this Court consider compromising a police officer's safety. Moreover, our holding in no way negates the ability of the police to obtain a voluntary consent to search when more than one police officer is present at the scene.

4. The Commonwealth presented conflicting evidence regarding Acosta's mastery of the English language. Before and during the searches of Acosta's vehicle, the officers conversed entirely in English. *Id.* at 30. However, at the police station, Monaghan felt it necessary to have Acosta advised of his *Miranda* rights in Spanish, and Acosta confirmed that he "knew English a little bit" but was more comfortable speaking in Spanish. *Id.* at 77.

5. The trial court considered the precise factors for consideration enumerated in *Strickler*, 563 Pa. at 72–73, 757 A.2d at 900–01 (stating that the factors to be considered in determining whether consent was voluntarily given include (a) the existence of a prior lawful detention; (b) the presence of numerous officers with marked patrol cars with flashing lights standing in close proximity to the defendant; (c) the absence of an express endpoint to the detention in the form of an admonition by the officer that the defendant is free to leave; and (d) the defendant's knowledge of his right to refuse to consent); *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177, 182 (1992) (noting that the failure to return the vehicle's documentation and continuing to question the driver on matters unrelated to the purpose of the initial stop and without reasonable grounds constituted an illegal seizure).

"the product of an essentially free and unconstrained choice[,]" but was "the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *See Mack,* 568 Pa. at 334, 796 A.2d at 970. The evidence supports the trial court's finding that Acosta's consent was not "voluntary".[6]

¶ 21 The Dissenting Opinion appears to rely upon the Pennsylvania Supreme Court's decision in *Mack* for its conclusion that Acosta's consent was not the product of coercion. However, the factual scenario in *Mack* is readily distinguishable from the circumstances of the instant case.

¶ 22 In *Mack,* Sergeant Kilrain ("Kilrain") of the Philadelphia Police Department received a telephone call from a police officer in Houston, Texas. The officer in Texas informed Kilrain that a narcotics-detector dog alerted to a piece of luggage that had been placed on a flight to Philadelphia. *Id.* at 331, 796 A.2d at 968. Kilrain and other officers confirmed that a flight was scheduled to arrive in Philadelphia from Houston. *Id.* When the flight arrived, they observed Alma Mack ("Mack") retrieve a piece of luggage matching the description of the bag described by Houston police. *Id.* at 331–32, 796 A.2d at 969.

¶ 23 An officer subsequently approached Mack, and asked to examine her luggage claim ticket. The ticket matched the claim number given by Houston police. *Id.* The officer asked Mack to accompany him to an airport office. Once inside, the officer gave Mack her *Miranda* warnings, and asked for her permission to search the bag. *Id.* The officer informed Mack that she could refuse, but if she refused, she would be detained in order to obtain a search warrant. *Id.* After Mack read a Consent to Search Form, and said nothing for about ten minutes, she consented to the search. *Id.* In her bag, the officers discovered three bricks of marijuana. *Id.*

¶ 24 Mack challenged the validity of her consent by filing a suppression motion, which the trial court denied. This Court affirmed the judgment of sentence, after which the Pennsylvania Supreme Court granted allowance of appeal. On appeal, the *Mack* Court was required to determine whether Mack "validly consented to the search of her baggage when, prior to giving her consent, the police advised [her] that they would apply for a warrant if she denied them permission to search." *Id.* at 333–34, 796 A.2d at 970.

¶ 25 In upholding the validity of the search, the *Mack* Court refused to adopt a *per se* rule that consent to search in the

---

6. The Dissenting Opinion re-weighs the evidence presented at the Suppression Hearing and adopts its own factual findings. For example, the Dissent finds that the "stress-inducing show of authority" in this case, is "not uncustomary to a traffic stop," and that the circumstances in this case are "commonplace to a lawful, roadside investigative detention." Dissenting Opinion at 1089, 1091. Similarly, the Dissenting Opinion finds that a transition occurred during Monaghan's questioning whereby Acosta should have been alerted that the investigation was no longer compulsory. *Id.* at 1091. However, the record supports the trial court's factual findings regarding the coercive nature of the request for consent. The trial court found that Monaghan had or-

dered Acosta out of the vehicle (*see* N.T., 12/4/00, at 23, 57), that there were three police cruisers with lights flashing lights present at the scene (*see* N.T., 12/4/00, at 29, 67), and that three uniformed police officers "stood next to each other in close proximity to [Acosta] when consent was requested" (*see id.* at 29). The Dissenting Opinion rejects this last finding and substitutes its own finding that the officers' positions were "neutral." Dissenting Opinion at 1091. In addition, the Dissent creates its own factual finding that the officer's request for consent was "sincere" and "genuine." *Id.* at 1091–92. This type of re-weighing of the evidence and creation of factual findings expressly violates our standard and scope of review.

context of a custodial detention is involuntary when police advise the suspect that they would get a search warrant if the suspect refused to consent to the search. *Id.* at 335, 796 A.2d 967, 796 A.2d at 971. The *Mack* Court concluded that "the statement by police that they 'would have to get a search warrant' is merely a factor, but not a dispositive one, in the totality of the circumstances that a court must review in determining whether the police coerced the individual into consenting to the search."[7] *Id.* In concluding that Mack's consent was voluntary, the Supreme Court considered the mitigating factors that police officers had advised Mack of her *Miranda* rights, and advised her that she could refuse to consent to the search. *Id.*

¶ 26 Here, unlike in *Mack,* Monaghan did not inform Acosta of his *Miranda* rights prior to requesting consent for the search. In addition, the officers did not advise Acosta that he was free *not* to consent to the search, a factor deemed significant in both *Strickler* and *Mack.* Moreover, unlike *Strickler,* there was no express endpoint to the initial lawful detention. Thus, the mitigating factors deemed significant in *Mack* and *Strickler* are not present in the instant case, and do not serve to outweigh the coercive atmosphere.

¶ 27 In summary, the totality of the circumstances supports the trial court's conclusion that Acosta's consent was the not product of a "free and unconstrained choice." *See Strickler,* 563 Pa. at 79, 757 A.2d at 901. On this basis, we affirm the Order of the trial court, which granted Acosta's Motion to suppress the evidence seized during the search.[8]

¶ 28 Order affirmed.

¶ 29 STEVENS, J., files a Dissenting Opinion.

¶ 30 JOYCE, J., joins Dissenting Opinion.

¶ 31 ORIE MELVIN, J., joins Dissenting Opinion.

¶ 32 LALLY–GREEN, J., joins Dissenting Opinion.

---

7. In *Mack,* unlike the instant case, the officers had probable cause to suspect a narcotics violation at the time they requested Mack's consent to search. *See Mack,* 568 Pa. at 335, 796 A.2d at 971 (stating that the officers simply advised Mack, "truthfully," that they would get a search warrant if she denied her consent to search). Here, Monaghan did not have probable cause to suspect a narcotics violation.

8. We further note that there is some question regarding the constitutionality of Monaghan's attempt to secure Acosta's consent during the investigative detention. In *Strickler,* the Pennsylvania Supreme Court noted that continuing a detention in order to seek consent for a search that is unrelated to the purpose of the detention, and which is not independently supported by reasonable suspicion, may be prohibited by Article I, Section 8 of the Pennsylvania Constitution. Analyzing the United States Supreme Court's decision in *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), the *Strickler* Court opined:

> Our jurisprudence under Article I, Section 8 of the Pennsylvania Constitution, however, would not sustain a consent search conducted in the context of, but which is wholly unrelated in its scope to, an ongoing detention, since there can be no constitutionally-valid detention independently or following a traffic or similar stop absent reasonable suspicion.

*Id.* at 69, 757 A.2d at 896 (citations omitted). The *Strickler* Court recognized that Article I, Section 8 of the Pennsylvania Constitution would appear to preclude the scenario presented in the instant case. Here, the Commonwealth presented no evidence that would support a reasonable suspicion that Acosta was engaged in drug activity before or during the traffic stop, and the initial detention had not ended at the time that Acosta's consent was requested.

STEVENS, J., Dissenting:

¶ 1 I agree with the Majority that Officer Monaghan requested Acosta's consent during an investigative detention that was lawful. I disagree, however, with its determination that Acosta's consent was coerced. A review of all competing factors pertinent to the voluntariness inquiry leads to the conclusion that Acosta's consent was not the product of an overborne will but was, instead, a deliberative election. The Majority fails to consider all pertinent competing interests, and makes its voluntariness determination on factors proving only that Acosta was subject to a lawful seizure at the time he consented. A voluntary consent may occur during a lawful seizure, as was the case here. Accordingly, I dissent.

¶ 2 It is well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The applicable procedure for determining the validity of consensual searches incident to traffic stops entails assessing the constitutional validity of the citizen-police encounter giving rise to the consent, and, ultimately, the voluntariness of consent. *Commonwealth v. Strickler*, 563 Pa. at 82, 757 A.2d at 903 (2000). Where the encounter is lawful, voluntariness becomes the sole focus. *Id.*

¶ 3 "The Fourth Amendment [9] test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.' " *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). A consent is "voluntary" when it is the "product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *See, generally, Robinette*, 519 U.S. at 40, 117 S.Ct. 417; *Mack*, 568 Pa. at 334, 796 A.2d at 970 (quoting *Strickler*, 563 Pa. at 79, 757 A.2d at 901). In determining whether a defendant's will was overborne, a court considers the factual circumstances surrounding consent, assesses the psychological impact on the accused, and evaluates the legal significance of how the accused reacted. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041. The inquiry is ultimately objective, and employs a reasonable person test presupposing an innocent person. *See Strickler, supra* (citing *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Nevertheless, factors aiding the inquiry into the "psychological impact" on the citizen include subjective matters such as the maturity, sophistication and mental or emotional state of the citizen (including age, intelligence, and capacity to exercise free will). *Id.*

¶ 4 Assessing the "circumstances surrounding consent" requires us to review

---

**9.** There is no support for the Majority's suggestion that Article I, § 8 requires a more stringent test for the voluntariness of a consent than does the Fourth Amendment. Though under certain circumstances Article I, § 8 of our constitution confers greater protections than its federal counterpart, "[the Pennsylvania Supreme Court's] recent decision in [*Commonwealth v.*] *Cleckley,* [558 Pa. 517, 738 A.2d 427 (1999),] lays the groundwork for alignment of Pennsylvania law with Fourth Amendment jurisprudence [with respect to

the issue of voluntariness of consent]. *See Cleckley,* 558 Pa. at 528, 738 A.2d at 433 (endorsing the *Schneckloth* test for voluntariness in the context of a request for consent to search made during the course of a mere encounter)." *Strickler,* 563 Pa. at 80, 757 A.2d at 902. *See also Commonwealth v. Mack,* 568 Pa. 329, 334, 796 A.2d 967, 970 (2002) ("The test for the validity of a consent to search is the same for both the Fourth Amendment and Article I, Section 8, i.e., that the consent is given voluntarily.").

aspects of the citizen-police interaction such as: the length and location of the detention; use of the detention itself as leverage in obtaining consent; the use of physical restraints; use of aggressive behavior or any use of language or tone by the officer that was not commensurate with the circumstances; the lack of any advice to the accused of his constitutional rights; whether the questioning was repetitive and prolonged; use of subtle or artful questioning; and the claim of lawful authority to conduct a search even if consent is withheld. *Id.*; *Mack, supra; Strickler, supra.*

¶ 5 No one factor in the voluntariness inquiry is controlling. *Strickler, supra.* "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone." *Schneckloth*, 412 U.S. at 229, 93 S.Ct. 2041. So it is that while a citizen's subjective knowledge of the right to refuse to consent is a factor to be taken into account, such knowledge is not a prerequisite to establishing voluntary consent. *Strickler*, 563 Pa. at 79, 757 A.2d at 901 (citing *Schneck-*

*loth, supra*). In fact, there is not even a presumption of invalidity or the assignment of extra weight to when a citizen consents without explicit notification that he or she was free to refuse to cooperate. *United States v. Drayton*, 536 U.S. 194, 122 S.Ct. 2105, 2113, 153 L.Ed.2d 242 (2002). Neither is a defendant's consent involuntary simply because it is given at a time when the defendant knows the search will produce evidence of a crime. *See United States v. Bennett*, 2000 U.S. Dist. Lexis 13472, *26 (E.D.Pa.2000) (heightened sense of coercion that a guilty citizen feels at the notion of a consent search not relevant to the voluntariness inquiry).

¶ 6 Both the lower court and the Majority largely overlook such factors, and instead give determinative weight to the fact that the detention had not reached an endpoint, that driving papers were not returned, and that several officers were present with their cruisers' overhead lights flashing. In so doing, the Majority Opinion stands for the proposition that insurmountable coercion exists in conditions commonplace to a lawful, roadside investigative detention.[10] Our jurisprudence has

---

10. Most troubling about the lower court and Majority opinions is that their application of the voluntariness test is limited to the four factors that the Pennsylvania Supreme Court used in *Strickler*, 563 Pa. at 76–77, 757 A.2d at 900–901, to determine whether Strickler was subject to a seizure at the time of his consent. *See* Majority Opinion at 13 n. 4. Only after applying said factors to find "that the request to search did not rise to a second or subsequent seizure under the Fourth Amendment" did the Pennsylvania Supreme Court "proceed to a voluntariness assessment." *Strickler*, 563 Pa. at 78, 757 A.2d at 901.

Both seizure and voluntariness inquiries rely on totality-of-circumstances tests, but the danger of equating the first-step inquiry meant to determine whether a seizure occurred with the second-step inquiry meant to determine whether consent was voluntary is

clear—the voluntariness of a consent would be recognized only where a "mere encounter" between citizen and police is first established. Some cases do present significant overlap in the factors used to determine seizure and voluntariness, especially "mere encounter" cases like *Strickler*, which logically holds that having reason to believe you can simply walk away from a police officer also means having reason to believe you can refuse a consent search. However, our jurisprudence has never limited the possibility of voluntary consent to the first type of interaction between police and citizenry. *See, e.g., Mack, supra*, (recognizing voluntary consent to a search during lawful custodial interrogation). The concurrence of lawful seizure and voluntary consent is clearly quite possible.

Because the present case involves a legitimate investigative detention, the application of *Strickler's* "mere encounter" analysis to

never adopted such a standard. *Compare Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177 (1992) (invalidating consent, even if given voluntarily, because officer's withholding of driving papers and request to search car on grounds unrelated to the legitimate initial stop and unsupported by reasonable suspicion constituted an unlawful second detention mandating application of exclusionary rule).[11] The conditions of a traffic stop are indisputably more burdensome to a citizen than are the conditions of a "mere or consensual encounter," but the fact that an ongoing investigative detention has been effected neither precludes an officer from asking a citizen for consent nor invalidates the consent given. Rather, pursuant to the totality of circumstances test, we look to the quality and manner of the investigative detention and its objective effect on the citizen to determine if consent was given voluntarily.

¶ 7 The facts before us show that the manner in which Officer Monaghan conducted the investigative detention favors a finding of voluntariness. Not only were the detention and the request for consent lawfully supported by reasonable suspicion,[12] they were carried out in a manner commensurate with the cooperative role Acosta adopted once he was stopped. That is, no tactics were employed to draw consent from Acosta. Officer Monaghan never used or threatened to use physical force apart from making the stop; never bore down on Acosta with an aggressive or disapproving voice or body language, or with a claim that he believed Acosta was running drugs; never removed the detention from the open-air, easily-visible roadside location; never used or threatened to use protracted detention to fatigue or frustrate Acosta; never conditioned Acosta's innocence or ability to leave on the granting of consent; and never attempted to leverage consent by claiming he could obtain authority to search the vehicle if consent was withheld. The questions asked of Acosta were tailored to the facts at hand, and were plain and direct. There is no suggestion that Officer Monaghan engaged

our facts has limited value. In investigative detention cases, the voluntariness inquiry cannot turn simply on whether a citizen has lost reason to believe he is free to go. It *must*, instead, turn on whether the circumstances of the seizure give reason to believe he cannot refuse an officer's request for consent to search. In other words, the inquiry asks if the citizen has reason to feel he retains the power to restrict the investigation from areas that apparently are to remain private without consent even though he has no reason to believe he can terminate the investigation altogether. In conducting this inquiry, courts are to make an accommodation of all competing societal and individual interests, as is done *infra*. *See Schneckloth*, 412 U.S. at 224–225, 93 S.Ct. 2041.

**11.** In the dicta of *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997) (en banc), we expanded *Lopez* beyond its actual holding with the passage "[t]his court has held [citizens] cannot consent [during a traffic stop] while the officer holds their identification." *Hoak*, 700 A.2d at 1267 (citation to *Lopez* omitted).

In fact, the holding in *Lopez* was limited to where an officer *unlawfully* retains a driver's identification despite having accomplished the purpose of the traffic stop. *Lopez* relies on the principle that unconstitutional seizures taint subsequent consents. Therefore, we held in *Lopez* that where an officer commits an unconstitutional seizure by withholding valid identification and detaining a driver for further questioning unrelated to the initial stop and unsupported by independent reasonable suspicion, any subsequent consent is fruit of the poisonous tree that must be suppressed. Clearly, we never advocated a *per se* preclusion of voluntary consent whenever an officer holds driving papers.

**12.** *See* footnote 8, *infra*, and its reliance on *United States v. Bennett*, *supra*, for the conclusion that Acosta fit a drug courier profile warranting its own investigative detention and justifying the request to conduct a consent search for drugs.

in subtleties or trickery. Indeed, Officer Monaghan asked but once for Acosta's consent to a search, and Acosta agreed.

¶ 8 Acosta's subjective attributes likewise weigh in favor of crediting his choice to consent as a voluntary one. Acosta is an adult man of ostensibly sound mind, normal intelligence, and the capacity for exercising free will. Though Spanish is Acosta's first language, he demonstrated sufficient proficiency in English for this Court to conclude that the exchange between himself and Officer Monaghan was knowing and meaningful. Acosta answered all questions put to him, including those that required more than "yes" or "no" answers. When asked about discrepancies in his documentation, he did not sit in silent confusion or claim not to understand, he articulated explanations. Acosta's claim of possessing a Minnesota Driver's License and his presentation of a department store ID card also suggested enough adeptness at using and understanding the English language to obtain services. Even Acosta's apparently extensive navigation of highways across multiple state lines suggests a comfort with English language directional signs.

¶ 9 Additionally, to the degree that the case involves a stress-inducing show of authority not uncustomary to a traffic stop, application of the reasonable person standard should dispel the notion that such a show of authority controls the outcome of the voluntariness inquiry. For example, a reasonable person would not expect an officer to return his driving papers and send him on his way when questions regarding the validity of such papers and authorization to operate the vehicle remain

unresolved. So too would a reasonable person understand the safety initiative of activating overhead lights to alert other drivers to the presence of a roadside stop. As for the presence of two other officers at the scene, they did not actively participate in the pre-consent investigation of Acosta but, instead, took the neutral position of standing nearby. *See Strickler, supra* (presence of back-up officer not significant where he was not an active participant).[13]

¶ 10 Finally, Acosta was not expressly apprised of his right to withhold consent, but such explicit notification need not be given to validate a consent, *See Strickler, supra.* Fair application of the reasonable person standard, moreover, requires us to find that a sincere request for consent made during a seizure at least tends to imply the right to refuse consent. The very fact that a sincere request for consent was made in this case must be factored in the voluntariness inquiry. As the United States Supreme Court stated:

> In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police Officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

*Drayton,* 122 S.Ct. at 2114. Here, the inference that Acosta retained the right to refuse consent is supported by the officer's transition from making directives to making a request.

---

**13.** Furthermore, to find that the presence of back-up patrol necessarily undermines voluntariness runs afoul of the goal to accommodate competing societal and individual interests, as society's interest in ensuring the safety of investigating officers is of great import.

Indeed, the Majority Opinion will force police officers who possess reasonable suspicion to make the Hobson's choice of either placing themselves at risk to preserve the vital option of requesting consent or ensuring their own safety to the detriment of that option.

¶ 11 Indeed, Officer Monaghan directed Acosta to pull over, directed him to produce papers, directed him to explain discrepancies in the information, and directed him out of the vehicle. Officer Monaghan never asked for Acosta's permission to conduct this phase of the interaction, and so it should have been clear to Acosta that his cooperation to that point was mandatory, not discretionary. But then, the exchange undergoes a marked difference in form. Officer Monaghan does not direct Acosta to yield to a vehicle search, he asks for Acosta's permission to conduct a search. Such a transition in the dialogue between officer and citizen, free of any coercion extraneous to a lawful investigative detention, alerts the citizen that the investigation is no longer compulsory but may continue only on his consent. The act of a sincere request thus infuses due process rights into the police/citizen encounter, and itself militates in favor of finding any consent given in response to be voluntary.

¶ 12 Therefore, the manner of the lawful investigation and Acosta's reaction thereto belies the Majority's opinion that Acosta's consent was coerced. Aided by neither overt nor subtle tactic identified as pertinent under established voluntariness inquiry, the officer issued a genuine request to conduct a consent search, and Acosta readily agreed. Indeed, as it ultimately took a drug-sniffing dog to discover what three officers could not, Acosta's consent would appear to reflect a confidence that the drugs were securely hidden rather than a purportedly overborne will from brief police questioning. Regardless of Acosta's subjective state of mind, however, the objective realities of the case do not evoke an involuntary consent.

¶ 13 To find otherwise simply because consent was given during a traffic stop performed before two other officers and activated police lights is a failure to accommodate society's legitimate need [14] for consent searches amid reasonable suspicion. To be sure, our courts have accommodated competing interests with the totality-of-circumstances balancing test to find consents voluntary under circumstances far more coercive than were present here. See Mack, supra (holding that Miranda warnings and time to consider explicit advisement of right to withhold consent offset extremely coercive conditions, which included: arrest of woman in airport terminal by one officer; confiscation of luggage; private office, closed-door interrogation conducted by sergeant and two law enforcement officers, with two airline employees also present; statement to woman that officers believed she had drugs in luggage; and an attempt to leverage consent with claim of authority to obtain warrant and override a refusal to consent).[15]

14. Consent searches may prevent false accusation of, and further embarrassment to, the innocent, and enable the apprehension of the guilty where no other investigative tool is available. "In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041.

15. Mack is instructive because it shows how offsetting factors may correspond to heightened coercive factors to avoid an overborne will. Where, as here, coercive factors identified as critical in Mack—an arrest, backroom interrogation, assertion of belief that detainee is guilty, and, especially, the attempt to leverage consent through a claim of authority to override refusal—are absent, it only follows that the balancing test requires less in the way of offsetting measures. A well-settled example of this point is the requirement that Miranda warnings be read before the commencement of a custodial interrogation, but need not be read before commencement of questioning in an investigative detention. See Schneckloth, 412 U.S. at 247, 93 S.Ct. 2041

¶ 14 Accordingly, I would find Acosta's consent voluntary, and would reverse the order of the suppression court.[16]

("*Miranda,* of course, did not reach investigative questioning of a person not in custody, which is most directly analogous to the situation of a consent search, and it assuredly did not indicate that such questioning ought to be deemed inherently coercive.") (citation omitted).

16. At the conclusion of its opinion, the Majority doubts the constitutional validity of the investigation into drug possession. If the Majority believes that the detention of Acosta exceeded its legitimate scope and duration prior to the request for consent, then the Majority should have confined its review to the predicate seizure analysis, deemed the seizure of Acosta unconstitutional, and applied the exclusionary rule to suppress the fruits of a tainted consent search. *See Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (request for consent unrelated in its scope to the purpose of ongoing detention, and not independently supported by reasonable suspicion, is its own unlawful detention to which exclusionary rule applies to suppress any consent derived therefrom); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000) (mandating exclusion of consent even if voluntarily given); *Lopez, supra.*

In any event, the record belies the Majority's opinion in this regard, as it shows that the consent search was based on reasonable suspicion, which had evolved during the course of a completely lawful investigative detention, that Acosta was a drug courier.

The established facts of this case are that Acosta was seen to exhibit unusually nervous behavior upon spotting the police cruiser in that he "changed the manner in which he was driving by straightening up, putting both hands on the steering wheel and *refusing* to look at the officer." Trial Court Opinion, 2/15/01, at 1 (emphasis added). Moreover, Acosta was driving a van with a suspended tag, he was unable to produce proper personal identification, and he gave the officer registration and insurance cards bearing another person's name.

Officer Monaghan's suspicions about Acosta's authority over the van were thus properly aroused, and his questions concerning from where the van came and to where Acosta was taking it were quite justified. When Acosta's response described a route known to Officer Monaghan as one commonly used by drug runners, Officer Monaghan had before him a sum of evidence that allowed for the reasonable suspicion that Acosta was a drug courier. *See Bennett, supra,* 2000 U.S. Dist. Lexis 13472, \*26 (E.D.Pa.2000) (person's unusually nervous behavior, carrying luggage he appeared unlikely to own, arriving from a known drug source city, and having no identification, satisfied drug courier profile which justified a *Terry* stop and subsequent request for a consent search) (citing *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (holding that government need not make greater showing under reasonable suspicion standard where case involves drug courier profiling)). *See also Freeman, supra,* (acknowledging that evidence of nervous behavior accompanied by other indication of criminal activity, such as taking route heavily traveled by drug dealers, is pertinent factor in determining whether investigative detention was justified); *Commonwealth v. Rogers,* 741 A.2d 813 (Pa.Super.1999), *appeal granted,* 563 Pa. 675, 759 A.2d 922 (2000) (nervous driver, who produces papers under name different from name on driver's license, along with presence of open laundry detergent box in back seat consistent with common method of masking drug odors, establish reasonable suspicion of drugs in vehicle).

Even if Officer Monaghan's initial purpose in executing the traffic stop was to issue a citation for expired tags, he was unable to accomplish such purpose when Acosta could not produce proof of valid interest in the van. This fact distinguishes the present case from holdings cited by the Majority, such as *Lopez, supra,* which turn on officers having extended lawful detentions beyond their legitimate endpoints. Moreover, even if the purpose of the detention increased in scope, it did so only after objective and lawfully-discovered circumstances first created reason to suspect

illegitimate operation of the vehicle and then, ultimately, operation of the van as drug run-ner. *See Strickler,* 563 Pa. at 69 n. 18, 757 A.2d at 896 n. 18 (quoting *United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995) ("sub-sequent *or concurrent* detentions for question-ing are justified only when the officer has 'reasonable suspicion' of illegal transactions in drugs or any other serious crime") (cita-tions omitted)) *(emphasis added). See also Robinette,* 519 U.S. at 38, 117 S.Ct. 417 (an officer's subjective intentions notwithstand-ing, a continued detention is not invalid where objective reasons justify the action).

Officer Monaghan's investigation into the possibility of drug running was, therefore, consistent with the principle underlying *Terry,* traffic, and other investigative stops, namely, that an officer need not feel constrained to inaction amidst reason to suspect criminality is afoot, even where suspicion may not amount to probable cause. Sound police work in service of the public good demands that an officer under circumstances as they developed in the present case maintain the status quo with a continued detention permit-ting investigation into the driver's connection with the vehicle and into the vehicle's cargo. A request to conduct a consent search is an accepted manner of furthering such an inves-tigation.

Accordingly, I find Officer Monaghan's re-quest to conduct a consent search permissible under both state and federal constitutions. The request was directly related to a lawful investigative detention and supported by an evolving reasonable suspicion that Acosta was transporting illegal drugs.