J-A28019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LAMAR AMAKER, | |
| Appellant | No. 1113 EDA 2015 |

Appeal from the Judgment of Sentence March 27, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000647-2014

BEFORE: PANELLA, SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.: **FILED FEBRUARY 01, 2017**

Appellant, Lamar Amaker, appeals from the judgment of sentence entered following his convictions of possession of a firearm prohibited, firearms not to be carried without a license, carrying firearms in public streets or public property, and resisting arrest. We affirm.

The trial court summarized the underlying facts of this case as follows:

> At the suppression hearing, the Commonwealth presented the testimony of Police Officer Steven Farley. Officer Farley has been a police officer with the Philadelphia Police Department for almost five years and throughout that time, he has been assigned to the 19th District. N.T. 1/29/2015 at 5. On November 21, 2013, at approximately 3:24 p.m., Officer Farley was on duty when he received a radio call advising him that a black male, wearing a black jacket, on crutches was seen with a gun on his waist, in the Target Store located at 4000 Monument

---

[*] Retired Senior Judge assigned to the Superior Court.

Road, in the city and county of Philadelphia. Id. at 5-7. Officer Farley was familiar with the referenced store; Officer Farley had made three to five arrests for retail theft crimes at that particular store and officers in his District frequently went to that store for retail theft crimes. Id.

Within minutes of the radio call, Officer Farley entered the Target Store, where he saw [Appellant] exiting the men's restroom. Id. at 8. [Appellant] matched the physical description of the reported suspect to a "T" - he was a black male, wearing a black jacket and, he was on crutches. Id. at 8, 13. Before Officer Farley said anything, [Appellant] appeared to look in Officer Farley's direction. Id. at 8. Based on his experience, Officer Farley believed that [Appellant] sighted him noting, "[he got] that oh-s--t look.... [H]is eyes got wide. He seemed to stop in his tracks. He immediately turned around and he re-entered the bathroom." Id. at 9. Officer Farley believed that [Appellant] was taking flight. Id. at 13.

Officer Farley followed [Appellant] into the restroom. Id. [Appellant] was standing in front of the sink, but he was not washing his hands; rather, he was looking in the mirror. Id. Officer Farley began to approach [Appellant] and as he did, he noticed a large bulk in the front of [Appellant's] jacket, dead center. Id. Officer Farley continued to approach [Appellant] and he proceeded to stand next to [Appellant], who then began to blade his body to the right, away from Officer Farley. Id. Officer Farley noticed that [Appellant's] right arm was down, at his waist area and at that point, Officer Farley told [Appellant], "keep your hands up." Id. at 9-10. Officer Farley explained that he did not know if [Appellant] had a weapon and for safety reason, he wanted to keep [Appellant's] hands in view. Id. at 10.

Officer Farley asked [Appellant] if he had a gun and he said no. Id. Thereafter, [Appellant] began to bring his right arm down again. Id. Officer Farley, again told [Appellant] to keep his hands up. Id. At that point, [Appellant] began to bring both of his arms down, towards his body. Id. Officer Farley grabbed [Appellant's] arms to secure them in handcuffs. Id. Officer Farley explained, "[Appellant] was not listening to my verbal commands ... [a]nd ... the right side of his body was turning away from me." Id. When Officer Farley grabbed [Appellant], he felt a hard, metal object in the front of [Appellant's] jacket,

which he immediately believed to be a firearm. Id. at 11, 15. For fear of his safety, Officer Farley performed a safety frisk; he patted down the front of [Appellant's] jacket. Id. at 11, 15. Officer Farley recovered a Mac-11 -- a submachine gun that is large and bulky. Id. at 11-12.

Officer Farley testified that he performed a safety frisk on [Appellant] because, "he matched the flash, which was specific ... male being on crutches .... he matched the flash to a 'T' ... I believed [there was] flight when he looked in my direction and retrieved back into the bathroom, the large bulge that I saw in the front of his jacket, the fact that he bladed his body away, the fact that he ignored my verbal commands to keep his hands in my view while I'm conducting an investigation, also the fact that I was solo and I didn't have any backup with me.... I feared for my safety. That's why I conducted a safety frisk." Id. at 12-13.

Trial Court Opinion, 3/16/16, at 2-4 (footnotes omitted).

On November 21, 2013, Appellant was arrested and charged with possession of a firearm prohibited, firearms not to be carried without a license, carrying firearms in public streets or public property, and resisting arrest. On June 2, 2014, Appellant filed an omnibus motion seeking to suppress physical evidence. The trial court held a suppression hearing on January 29, 2015, at the conclusion of which the trial court denied Appellant's motion. The matter immediately proceeded to a stipulated nonjury trial. The trial court found Appellant guilty of all the crimes charged. On March 27, 2015, the trial court sentenced Appellant to a term of incarceration of five to ten years for the conviction of possession of a firearm prohibited and a concurrent term of incarceration of two and one-half to five years for the conviction of firearms not to be carried without a license. No further penalty was imposed on the remaining convictions. This timely

- 3 -

J-A28019-16

appeal followed.  Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issue for our review:

I. Did the Lower Court err in denying Appellant's Motion to Suppress Physical Evidence based on lack of justification[?]

Appellant's Brief at 3.

In his sole issue, Appellant argues that the trial court erred in denying his motion to suppress physical evidence.  Appellant's Brief at 8-14. Specifically, Appellant contends that the police officer lacked reasonable suspicion to stop and frisk Appellant.  *Id*. at 14.[1]

With respect to an appeal from the denial of a motion to suppress, our Supreme Court has stated the following:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  When reviewing the ruling of a suppression court, we must consider only the

_____

[1]  As the Commonwealth properly notes in its brief:

In his summary of argument, [Appellant] suggests that the stop transformed into an arrest when Officer Farley told him to keep his hands up (Brief for Appellant, 7), but he does not pursue such a claim in the body of his brief.  It is therefore waived. Commonwealth v. Delvalle, 74 A.3d 1081, 1086-87 (Pa. Super. 2013) (finding claims waived for failure to meaningfully develop them in the body of the brief).

Commonwealth's Brief at 11 n.2.  We are constrained to agree that Appellant has abandoned any claim in this regard by failing to develop it in the argument portion of his brief.  Pa.R.A.P. 2119(a).

- 4 -

evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, we note that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).[2] In addition, questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent

---

[2] On October 30, 2013, our Supreme Court decided *In re L.J.*, in which the Court held that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *L.J.*, 79 A.3d at 1087. Prior to *L.J.*, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." *Commonwealth v. Charleston*, 16 A.3d 505, 516 (Pa. Super. 2011) (quoting *Commonwealth v. Chacko*, 459 A.2d 311 (Pa. 1983)). *L.J.* thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing. In this case, the incident occurred and Appellant's charges were filed after *L.J.* was decided. Therefore, we apply the rule announced in *L.J.* to the case at bar. *See L.J.*, 79 A.3d at 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision").

an abuse of discretion. **Commonwealth v. Freidl**, 834 A.2d 638, 641 (Pa. Super. 2003).

Further, we are aware that Pa.R.Crim.P. 581, which addresses the suppression of evidence, provides in relevant part as follows:

(H) The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

Pa.R.Crim.P. 581(H).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." **Schneckloth v. Bustamonte**, 412 U.S. 218, 236, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); **Commonwealth v. Blair**, 394 Pa. Super. 207, 575 A.2d 593, 596 (Pa. Super. 1990).

**Commonwealth v. By**, 812 A.2d 1250, 1254 (Pa. Super. 2002).

To secure the right of citizens to be free from intrusions by police, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive. **Commonwealth v. Beasley**, 761 A.2d 621, 624 (Pa. Super. 2000).

It is undisputed that:

[s]tate case law recognizes three categories of interaction between police officers and citizens, which include: (1) a mere encounter, or request for information, which need not be supported by any level of suspicion, but which carries no official compulsion to stop or to respond; (2) an investigative detention, which must be supported by reasonable suspicion as it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional

- 6 -

equivalent of an arrest; and (3) arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Acosta*, 815 A.2d 1078, 1082 (Pa. Super. 2003) (*en banc*).

If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. *Commonwealth v. Boswell*, 721 A.2d 336, 340 (Pa. 1998). To effectuate an investigative detention, the officers are required to have reasonable suspicion that unlawful activity was in progress. As we explained in *Commonwealth v. Walls*, 53 A.3d 889, (Pa. Super. 2012),

> The determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances. It is the duty of the suppression court to independently evaluate whether, under the particular facts of a case, an objectively reasonable police officer would have reasonably suspected criminal activity was afoot.

*Id*. at 893 (quoting *Commonwealth v. Gutierrez*, 36 A.3d 1104, 1107-1108 (Pa. Super. 2012)). In *Walls*, we concluded that "unprovoked flight, even when not in a high crime area, combined with [the defendant's] proximity to the location described in the [police radio] flash, and [the defendant's] matching the description of the suspect, does give rise to reasonable suspicion that criminal activity was afoot." *Walls*, 53 A.3d at 894. *See also In the Interest of D.M.*, 781 A.2d 1161, 1164 (Pa. 2001) (finding that an anonymous report that a person matching the appellant's

description was on a particular corner in a high-crime area with a gun, "coupled with" appellant's flight once officers arrived on the scene and began to approach him, was sufficient to create a reasonable suspicion justifying an investigative detention and pat-down for weapons).

Our review of the record reflects that the police officer in question possessed the requisite reasonable suspicion when he stopped Appellant and subsequently performed a safety frisk. Officer Steven Farley of the Philadelphia Police testified that on November 21, 2013, at 3:24 p.m., he responded to a police radio call of a person with a gun at the Target store on Monument Road in Philadelphia. N.T., 1/29/15, at 5-7. Specifically, the flash information received by the officer indicated that a black male, wearing a black jacket, and using crutches was in the Target store with a gun on his waist. *Id*. at 8. Officer Farley stated that he entered the Target store approximately two minutes after receiving the police radio call. *Id*. Shortly after arriving at the store, the officer observed Appellant exiting the men's restroom. *Id*. Officer Farley explained his initial observation of Appellant as follows:

> As [Appellant] came out of the restroom, Your Honor, I observed him. He matched the flash information. It was a black male. [Appellant] was wearing a black jacket. He was also on crutches. [Appellant] appeared to look in my direction. I was standing more towards the entrance of the store. Why I thought he was looking in my direction is because it appeared to me when he observed me -- the only way I usually know -- excuse my language -- it would like the oh-shit look. You know, his eyes got wide. [Appellant] seemed to stop in his tracks. He immediately turned around and he re-entered the bathroom.

*Id*. at 9.

Officer Farley then testified that he followed Appellant into the restroom and observed Appellant standing at the sink looking into the mirror. *Id*. The officer stated that at that time he stopped Appellant for investigation. *Id*.

Officer Farley indicated that, when he approached Appellant from Appellant's left side; he noticed a large bulge in the front center of Appellant's jacket. *Id*. at 9-10. In addition, as the officer was approaching Appellant, Appellant began to turn his body away toward his right side and his right arm was down near his waist. *Id*. at 10. In response, Officer Farley told Appellant to "[k]eep his hands in view so I can see them." *Id*. The officer explained that he made the preceding comment for his own safety and that he "always want[s] to watch somebody's hands." *Id*. Officer Farley then stated the following:

> I asked him -- I wasn't sure of the nature of the call. I didn't know if [Appellant] had a permit to carry. I didn't know if, you know, at the time -- I asked him if he had a gun on him, and he said no. So I was talking to him, and he started bringing his arm down again. I was by myself. I didn't have backup. I told him again to keep his hands up. At that time, he began to bring both of his arms kind of down and towards his body. At that time, that's when, you know, I grabbed both of his arms and I put them behind his back so I could secure him in handcuffs. He wasn't listening to my verbal commands. And, again, like I said, he was -- the right side of his body was turning away from me.

*Id*. at 10-11.

Officer Farley ultimately offered the following summation to explain why he approached Appellant and patted him down:

The fact that he matched the flash.

It was a specific flash, too, Your Honor, where, you know, male being on crutches. You know, I believed that [Appellant] matched the flash to a "T" with that -- what I believed as flight when I believe that he looked in my direction and retrieved [sic] back into the bathroom, the large bulge that I saw in the front of his jacket, the fact that he bladed his body away, the fact that he ignored my verbal commands to keep his hands in my view while I'm conducting an investigation, also the fact that I was solo and I didn't have any backup with me. At that time, I feared for my safety. That's why I conducted a safety frisk.

*Id*. at 13.

The totality of these facts in the knowledge of the officer at the time was sufficient to establish reasonable suspicion of criminal activity necessary to detain Appellant. Thus, because the police officer articulated facts at the suppression hearing that would give rise to a reasonable suspicion of criminal activity, we conclude that the detention was lawful and that the trial court properly held the evidence garnered as a result thereof should not be suppressed. Therefore, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/1/2017