**Commonwealth v. Hart**

C.P. of Lehigh County, no. 1737/2009.

*Stephen M. Van Natten, chief deputy district attorney,* for Commonwealth.

*Eric K. Dowdle,* for defendant.

DANTOS, *J.,* October 27, 2010—Defendant, Clarence Hart, has filed an appeal from this court's order of July 29, 2010, which denied the defendant's post sentence motions. Accordingly, we are issuing this opinion pursuant to the provisions of Pennsylvania Rule of Appellate Procedure 1925.

The relevant facts are as follows: Defendant, Clarence Henry Hart, after a jury trial, was found guilty of the charges of robbery[1], burglary,[2] theft by unlawful taking[3], simple assault[4], criminal conspiracy to commit robbery[5] and criminal conspiracy to commit burglary.[6] Thereafter, on July 6, 2010, this court sentenced the defendant to the following: On the count of robbery, imprisonment in a state correctional institution for a period of not less than five (5) years nor more than ten (10) years; on the count of burglary, imprisonment a state correctional institution for a period of not less than ten (10) years nor more than twenty (20) years; on the count of simple assault, imprisonment in a state correctional institution for a period of not less than one (1) year nor more than two (2) years; on the count of criminal conspiracy to commit burglary, imprisonment in a state correctional institution for a period of not less than ten (10) years nor more than twenty (20) years; and on the count of criminal conspiracy to commit robbery, imprisonment in a state correctional institution for a period of not less than five (5) years nor more than ten (10) years. All sentences were ordered to run consecutively to each other, with an aggregate sentence of thirty-one (31) to sixty-two (62) years. Thereafter, the defendant filed post sentence motions pursuant to Pennsylvania Rule of Criminal Procedure Rule 720. In his post-sentence motion, the defendant challenged the sufficiency and weight of the evidence. Additionally, the defendant requested that this

---

1. 18 Pa. C.S.A. §3701(a)(1)(iv).
2. 18 Pa. C.S.A. §3502(a).
3. 18 Pa. C.S.A. §3921(a).
4. 18 Pa. C.S.A. §2701(a)(1).
5. 18 Pa. C.S.A. §3701(a)(1)(iv); 18 Pa. C.S.A. §903.
6. 18 Pa. C.S.A. §3502(a); 18 Pa. C.S.A. §903.

court reconsider and modify the sentence imposed. This court denied the defendant's post sentence motions on July 29, 2010. The within appeal followed on August 19, 2010.

On August 23, 2010, this court instructed the defendant to file of record and serve upon this court a concise statement of errors complained of on appeal no later than September 13, 2010, in accordance with Pennsylvania Rule of Appellate Procedure 1925(b). Defendant complied with this order. In his concise statement of errors complained of on appeal, the defendant asserts several allegations of error: (1) this court erred in denying the defendant's *Batson* challenge as to the commonwealth's strike of a prospective juror; (2) this court erred in sentencing the defendant to an unduly harsh sentence and erroneously failed to note that the defendant was a productive member of society; (3) this court erred in denying the defendant's motion for a new trial, in so far as the verdict was against the weight of the evidence; (4) this court erred in denying the defendant's motion to suppress the search of defendant's vehicle, in so far as the search was the product of coercion, and not a knowing and voluntary waiver; (5) this court erred in denying the defendant's motion to dismiss counsel, as well as the defendant's motion to proceed pro se; and (6) this court erred in denying the defendant's motion for recusal. These arguments are baseless and defendant's appeal must be dismissed.

## A. *Batson Challenge*

The defendant argues that this court committed an error of law by denying the defendant's *Batson* challenge

as to the commonwealth's strike of a prospective juror.[7] See *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This contention is legally flawed.

In *Batson*, the United States Supreme Court held that the "Equal Protection Clause forbids [a] prosecutor to challenge potential jurors solely on account of their race." *Batson*, 476 U.S. at 89, 106 S.Ct. 1712. Indeed, the United States Supreme Court's *Batson* decision revolutionized the jury selection process by "overruling prior case law and allowing an individual defendant to show that he was denied equal protection by the prosecutor's improper exercise of peremptory challenges in a racially discriminatory manner in his individual case." *Commonwealth v. Sneed*, 587 Pa. 318, 899 A. 2d 1067 (2006).

Under *Batson*, once the objecting party makes out a prima facie case of discrimination, the burden shifts to the striking party to provide a race-neutral explanation for the challenge. *Commonwealth v. Daniels*, 600 Pa. 1, 42, 963 A.2d 409, 434 (2009). Then, it is incumbent upon the trial court to make the ultimate determination of whether the objecting party has carried its burden of proving purposeful discrimination. *Commonwealth v. Cook*, 597 Pa. 572, 586, 952 A.2d 594, 602 (2008). To establish a prima facie case of purposeful discrimination, the defendant must show that he is a member of a cognizable racial group, that the

---

7. In his concise statement of errors complained of on appeal, the defendant fails to refer to a specific juror. Consequently, this court will address all of the potential jurors discussed at the time of voir dire, even though the concise statement of errors complained of reveals that he is challenging the commonwealth's striking of only *one* potential juror: "Whether this court erred in denying defendant's *Batson* challenge as to the commonwealth's strike of a prospective juror." (concise statement of errors complained of on Appeal, ¶1).

prosecutor exercised a peremptory challenge or challenges to remove from the venire members of the defendant's race, and that other relevant circumstances combine to raise an inference that the prosecutor removed the juror for racial reasons. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

In the instant case, the defendant is African American and is a member of a cognizable racial group. The defendant argues that the commonwealth improperly used peremptory challenges to exclude two (2) potential jurors based solely on their race. Specifically, juror number 3, juror number 8 and juror number 21. As an initial matter, it is not clear that juror numbers 8 and 21 are African-Americans. Juror Number 8 was a 20-year-old woman who *appeared* to be African-American, but had checked "other" as her race. Similarly, juror number 21 was a 30 year old female of mixed descent. Therefore, this court is not even certain that juror numbers 8 and 21 are the same race as the defendant, let alone members of a cognizable racial group. Nevertheless, in an abundance of caution, this court will address same.

This court notes that these two (2) are the *sole* peremptory challenges that the commonwealth utilized on a potential "African-American"[8] juror. All other African-Americans in the jury pool were selected or dismissed for cause. In particular, juror number 3, an African-American, was dismissed from the panel "for cause" agreed upon by both the commonwealth and the defendant. Additionally, potential juror number 32, a 50-year-old African-American

---

8. The quotes indicate this court's hesitancy in categorizing the jurors' race as African-American.

woman was seated on the jury panel. Therefore, there was no "course of conduct" on behalf of the commonwealth to suggest purposeful discrimination. Additionally, the defendant failed to set forth facts and circumstances that raise an inference that the commonwealth excluded people from the jury on account of their race. Thus, this court does not find that the defendant sustained his burden.

Assuming, arguendo, that the defendant had established a prima facie case of improper use of peremptory challenges, and the burden shifted to the commonwealth, the prosecutor set forth on the record race-neutral reasons for his challenge of juror numbers 8 and 21. Specifically, with regard to juror number 8, the commonwealth cited to her meek and timid manner of verbally responding to questions, as well as her young age and lack of life experience. With regard to juror number 21, the commonwealth explained that she made numerous errors in completing the juror questionnaire form, had no position one way or the other, and was a victim of a robbery which is the central crime in the within matter.

This court found the prosecutor's reasons for exercising his peremptory challenges were factually valid, without discriminatory intent, and accepted them as legitimate race-neutral reasons for striking juror number 8 and juror number 21. This court's assessment of the genuineness of the commonwealth's reasons must, of necessity, be accorded great deference on appeal because the ultimate question of discriminatory intent involves an assessment of credibility. *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Commonwealth v. Lloyd*. 376 Pa.

Super. 188, 198, 545 A.2d 890, 895 (1988). Indeed, only if the court's findings are "unsupported by the record or appear to be unreasonable or arbitrary in the face of clear evidence to the contrary" should this court's findings be disturbed. *Id.* Such is not the case.

## B. *Unduly Harsh Sentence*

In his concise statement of errors complained of on appeal, the defendant asserts that this court erred in imposing an unduly harsh sentence without noting that the defendant was a productive member of society. The defendant is challenging the discretionary aspects of sentencing. *Commonwealth v. Bishop.* 831 A.2d 656, 660 (Pa. Super. 2003). Initially this court notes that:

> Sentencing is within the sound discretion of the sentencing judge, and that decision will not be disturbed absent an abuse of discretion. *Commonwealth v. Jones,* 418 Pa. Super. 93, 613 A.2d 587, 591 (1992)(en banc). "To constitute an abuse of discretion, the sentence imposed must either exceed the statutory limits or be manifestly excessive." *Commonwealth v. Gaddis,* 432 Pa. Super. 523, 639 A.2d 462, 469 (1994). Nevertheless, sentencing guidelines are merely advisory, and the court may, in its discretion, sentence outside the guidelines. When a trial court deviates from the guidelines, it must state its reasons for deviation on the record at the time of sentencing or in a contemporaneous written statement. *Commonwealth v. Lawson,* 437 Pa. Super. 521, 650 A.2d 876, 881 (1994). The court must also consider the guidelines as a starting point and deviate so as to impose a sentence consistent with both the public's

safety needs and the defendant's rehabilitative needs. *Id. Commonwealth v. Shaffer*, 722 A.2d 195, 198-199 (Pa. Super. 1998).

If "the sentencing court proffers reasons indicating that its decision to depart from the guidelines is not unreasonable," its responsibilities have been fulfilled and the appellate courts will not disturb the sentence. *Commonwealth v. Gibson*, 716 A.2d 1275, 1277 (Pa. Super. 1998).

In the instant case, the defendant's minimum sentence for each offense was beyond the aggravated range and set at the statutory minimum. Similarly, the maximum sentence for each offense was set at the statutory maximum. Unquestionably, the sentences imposed did not exceed the statutory limits. Therefore, the defendant's sentence must be evaluated to determine if it was "manifestly excessive." To do so, the following considerations must be examined:

> In determining whether a sentence is manifestly excessive, the appellate court must give great weight to the sentencing court's discretion, as he or she is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance, or indifference. *Commonwealth v. Ellis*, 700 A.2d 948, 958 (Pa. Super. 1997). Where an excessiveness claim is based on a court's sentencing outside the guideline ranges, we look, at a minimum, for an indication on the record that the sentencing court understood the suggested sentencing range. 42 Pa. C.S.A. § 9721(b).

When the court so indicates, it may deviate from the guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, the gravity of the particular offenses as it relates to the impact on the life of the victim and the community, so long as the court also states of record the factual basis and specific reasons which compelled him to deviate from the guideline range. *Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa. Super. 2003) (citations omitted).

Moreover, "[i]t is well-settled that appeals of discretionary aspects of a sentence are not reviewable as a matter of right." *Commonwealth v. Ladamus*, 896 A.2d 592, 595 (Pa. Super. 2006); see also *Commonwealth v. Shugars*, 895 A.2d 1270, 1274 (Pa. Super. 2006); *Commonwealth v. McNabb*, 819 A.2d 54, 55 (Pa. Super. 2003). The defendant must demonstrate that a substantial question exists concerning the sentence. *Commonwealth v. Lee*, 876 A.2d 408, 411 (Pa. Super. 2005). Furthermore, a substantial question requires something more than an allegation that the sentences imposed are excessive or harsh. *Ladamus*, 896 A.2d at 595. Consequently, defendant's assertion that this court abused its discretion by imposing an excessive and harsh sentence fails to present a substantial question to justify a review of his claim.

Additionally, even if the merit of the defendant's sentencing claim were addressed, defendant's argument must fail. The defendant's sentence must initially be evaluated to determine if there was an abuse of discretion. *Commonwealth v. Walls*, 926 A.2d 957 (Pa. 2007). The

standard of review has been explained in the following manner:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006), citing *Commonwealth v. Rodda*, 723 A.2d 212, 214 (Pa. Super. 1999)(en banc).

In imposing the defendant's sentence, this court considered the "protection of the public, the gravity of the offense as it relates to the impact on the victim and the community, the defendant's rehabilitative needs, and the sentencing guidelines." 42 Pa. C.S.A. § 9721(b); *Commonwealth v. Feucht*, 955 A.2d 377, 383 (Pa. Super. 2008). Prior to sentencing, this court carefully reviewed the pre-sentence investigation report prepared on May 5, 2010. At the time of sentencing, this court heard from Peter Fuller, who made a statement on his own behalf, as well as read a victim impact statement authored by Ms. Benner.

This court articulated that the defendant had forty-four (44) arrests in approximately thirty-four (34) years of his adult life, including nineteen (19) known convictions. Defendant's prior record would translate to a prior record

score of "18." However, the law does not provide for such a deplorable score, but caps at a prior record score of "5." Therefore, the guidelines do not adequately factor in such a horrific and appalling criminal past. Furthermore, the within crimes were extremely brutal in nature given that with each successive blow the hits were getting stronger and stronger and Ms. Benner did not know if she was going to survive.[9] The defendant's actions could have resulted in the death of this victim. Additionally, Ms. Benner was particular vulnerable in light of her age. The defendant displayed no remorse and his actions have shown defiance and indifference to the criminal justice system.

The defendant is not and has never been a productive member of society in light of his extensive criminal history. In fact, the defendant is a "career criminal" from which the community needs to be protected. Even though the defendant was gainfully employed for three and a half (3 ½) years with Patterned Concrete, this court did not err in classifying the defendant as a non-productive member of society. The defendant's deplorable and shameful criminal history speaks for itself. The defendant is a predator on society and selects easy targets as his prey.

Also, this court did not fail to consider mitigating factors. *Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12(1988) (holding that where a pre-sentence report exists, there is a presumption that the sentencing judge was aware of and adequately considered information relevant

---

9. The defendant's actions and means that he used to obtain money from this victim went far beyond what was necessary to accomplish his goal. The defendant has a history of violent crimes and unnecessarily using extreme force.

to the defendant's character, as well as any mitigating factors). With *all* of this information in mind, the major factors driving the defendant's sentence included the brutal nature of the crimes committed, in conjunction with the defendant's poor candidacy for rehabilitation and treatment; the fact that the sentencing guidelines do not adequately reflect his involvement in illegal activity for a span of four (4) decades; the fact that the defendant's actions could have resulted in the death of his victim who was particularly vulnerable due to her age; the impact on the victim; and the protection of the community. Indeed, the sentence ordered was necessary and reasonable under the circumstances. Using its discretion, this court imposed a sentence that was within the guidelines and within the law.[10] Accordingly, the defendant's argument is baseless and his appeal should be dismissed with regard to this allegation of error.

## C. *Challenging the Weight of the Evidence*

The defendant also alleges that this court erred in finding that the verdict was not against the weight of the evidence.

---

10. Additionally, it is axiomatic that the imposition of consecutive rather than concurrent sentences lies within the sound discretion of the sentencing court. *Commonwealth v. Booze*, 953 A.2d 1263, 1279 (Pa. Super. 2008). Long-standing precedent recognizes that 42 Pa. C.S.A. §9721 affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed. 42 Pa. C.S.A. §9721. See also *Commonwealth v. Johnson*, 961 A.2d 877, 880 (Pa. Super. 2008); *Commonwealth v. Marts*, 889 A.2d 608, 612 (Pa. Super. 2005). "A challenge to the imposition of consecutive rather than concurrent sentences does not present a substantial question regarding the discretionary aspects of sentence." *Commonwealth v. Lloyd*, 878 A.2d 867, 873 (Pa. Super. 2005). Indeed, the Superior Court of Pennsylvania has stated: "We see no reason why [a defendant] should be afforded a 'volume discount' for his crimes by having all sentences run concurrently." *Commonwealth v. Hoag*, 445 Pa. Super. 455, 665 A.2d 1212, 1214 (1995).

This court notes that a motion for a new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict, but contends that it is against the weight of the evidence. *Commonwealth v. Widmer*, 560 Pa. 308, 319, 744 A.2d 745, 751 (2000); *Commonwealth v. Bennett*, 827 A.2d 469, 481 (Pa. Super. 2003). Furthermore, a challenge that the verdict is against the weight of the evidence requires this court to conclude in its discretion that "the verdict is so contrary to the evidence as to shock one's sense of justice." *Lyons*, 833 A.2d at 258. Indeed, for a new trial to lie on a challenge that the verdict is against the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Shaffer*, 722 A.2d 195, 200 (Pa. Super. 1998). See also *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003).

In the within matter, the testimony and physical evidence provided sufficient evidence to demonstrate that the defendant committed the aforementioned offenses. Indeed, on November 28, 2008, at approximately 6:00 P.M., Barbara Benner, an eighty-three- (83) year-old woman, was returning to her residence located at 225 North Broad Street, Allentown, after purchasing wine at a liquor store located at 19th and Allen Streets, Allentown, Lehigh County, Pennsylvania.[11] (C. Ex. 3) Ms. Benner's residence is situated between 27th and 28th Streets, Allentown, and is less than ten (10) minutes from the liquor store by vehicle. Upon arriving at her residence

_____

11. Ms. Benner had gone to the liquor store alone that evening to purchase two (2) or three (3) bottles of wine to share with her family during dinner that night.

in her vehicle, Ms. Benner drove into her driveway and opened her garage door utilizing a garage door opener.[12] (C. Ex. 4; C. Ex. 5; C. Ex. 6) Ms. Benner then drove into the garage attached to her home and parked her vehicle. (C. Ex. 4; C. Ex. 5; C. Ex. 6)

Upon exiting her vehicle, Ms. Benner pushed the button that is secured on the inside wall of the garage by the interior garage door leading into the kitchen in an effort to close the garage door. The garage door began to close, but due to interference, went back up. Ms. Benner investigated the garage door track to confirm that the path was unobstructed. She then proceeded to push the garage door button another time. Suddenly, a man[13] jumped out at her screaming, with his arms flailing in the air.[14] He swiftly came around her vehicle that was parked in the garage, and grabbed Ms. Benner. As a result of the physical contact between Ms. Benner and the man, Ms. Benner ended up on the floor of her garage. The man was situated on top of her and was repeatedly striking[15] Ms. Benner in the face and shoulders with his fists. The man snatched Ms. Benner's Vera Bradley purse[16] from her grasp. Although Ms. Benner did not see the man's face, she indicated that the perpetrator was wearing a dark hat, dark clothes and

---

12. The interior garage door light illuminates when the garage door is activated.

13. Ms. Benner could determine that the attacker was a man because of the manner in which he walked and moved.

14. Initially, Ms. Benner thought that someone was playing a trick on her. However, as the male figure continued to approach her, she quickly realized it was not a joke.

15. With each successive blow, the hits were getting progressively stronger.

16. The purse contained important papers, credit cards and approximately three hundred ($300.00) dollars in cash.

gloves, and had his face covered with either a mask or a scarf. She also stated that the perpetrator was short,[17] but taller than she is by about four (4) to five (5) inches.[18] Ms. Benner could not determine the man's race or ethnicity.

Ms. Benner's granddaughter, Kioko Furst, opened the interior garage door to help her grandmother carry the bottles of wine into the residence. By doing so, she startled the perpetrator, who began to flee from the garage and run towards a gray vehicle parked[19] across the street.[20] Upon learning that something was wrong, Ms. Benner's son-in-law, Peter Fuller, and her grandson, Nicholas Furst, immediately began to chase the male figure. Mr. Fuller, taking a direct path to the parked gray vehicle, witnessed the attacker jump into the rear driver's side door and motion for the driver to pull away. Mr. Fuller had the opportunity to peer into the gray sedan and he observed what appeared to be a light-skinned Hispanic woman with reddish bleached-blonde hair sitting in the driver's seat. The grandson and Mr. Fuller clearly viewed the Pennsylvania license plate of the vehicle, to wit, GYA-2642.[21]

Mr. Fuller described the perpetrator as wearing a black

---

17. Ms. Benner did note that while she described the male as "short" in stature, he was taller than she was.

18. Ms. Benner is 5'2" tall. Although Ms. Benner could only estimate the perpetrator's height, she was cognizant of the fact that the perpetrator appeared short for a man.

19. The gray sedan had the engine running.

20. Ms. Benner's granddaughter called the police and the events that transpired were related to the responding officers. (C. Ex. 3). Officer George Heiserman indicated that he was told that the perpetrator was an African American male, standing approximately 5'5" tall.

21. Ultimately the grandson wrote down the license plate numbers that he observed.

puffy coat, gloves, dark hat, dark pants. Mr. Fuller also noted that he jogged in an unusual and distinctive way, i.e. an "up and down motion," almost as if he were running on his toes. While Ms. Benner's son-in-law and grandson were pursuing the attacker, her daughter, Joan Fuller, tended to Ms. Benner and her injuries. Ms. Benner was bloody, with scratches on her face and ear.[22]

Thereafter, on November 30, 2008, Officer Damien Murray of the Allentown Police Department responded to a call of a purse being found in the vicinity of 133 South Lumber Street, Allentown, Lehigh County. (C. Ex. 1; C. Ex. 8; C. ex. 9; C. Ex. 10; C. Ex. 11). The homeowner at that location had found Ms. Benner's purse on her porch. (C. Ex. 1; C. Ex. 8; C. ex. 9; C. Ex. 10; C. Ex. 11). Officer Murray recovered the purse. (C. Ex. 1). Additionally, the Communications Center informed Officer Murray that there had been a home invasion robbery two (2) days earlier involving the owner of the purse. Consequently, Officer Murray then telephoned Ms. Benner and made arrangements to deliver the purse to her. Upon inspecting the purse, Ms. Benner noted that the purse was not in the condition that it had been in two (2) days earlier. (C. Ex. 1). Specifically, the purse was now dirty and had a slit in it, like it had been cut. (C. Ex. 1). Additionally, the three hundred ($300.00) dollars in cash had been removed. (C. Ex. 1). Also, a bag from McDonald's with a receipt inside indicating a purchase of small fries did not belong to Ms. Benner and they were not in her purse prior to it being taken. (C. Ex. 12).

---

22. Ms. Benner was in fear of being hurt or killed during the attack that she endured on November 28, 2008.

In response to the information that Ms. Benner provided to Officer Murray and in possession of the McDonald's receipt dated November 28, 2008, at 5:24 P.M., Officer Murray went to the McDonald's located at 14th and Tilghman Streets, Allentown (C. Ex. 12). Officer Murray viewed footage of the McDonald's surveillance videos for that date and time (C. Ex. 12). In the surveillance photos, Officer Murray observed a black male with a bright orange hat purchasing a small order of fries at the designated time[23] (C. Ex. 18).

Assisting in the investigation further, Officer Murray ran the license plate information that had been provided to him by Ms. Benner through the PennDOT system. Officer Murray was notified that the plate belonged to a rental vehicle from the Enterprise Rental Cars fleet. Officer Murray contacted Enterprise Rental Cars and was informed that the individual who rented the subject vehicle was Clarence Hart, with an address of 1734 Chew Street, Allentown[24] (C. Ex. 19). Officer Murray traveled to the 1700 block of Chew Street and determined that the address was a recovery house. Officer Murray learned that defendant Clarence Hart no longer resided in the recovery

---

23. Officer Murray copied the surveillance footage from McDonald's onto a disk. However, the disk on which he burned the images was unusable. Consequently, on or about December 3, 2008, Detective Eric Landis made another copy of the video surveillance. Detective Landis also printed still photos from the surveillance video (C. Ex. 18; C. Ex. 20).

The defendant stipulated that the person in the McDonald's video was the defendant. (C. Ex. 24).

24. In furtherance of the investigation, Detective Landis spoke with a representative of Enterprise Rental Cars located at 13th and Tilghman Streets, Allentown. Subsequently, Detective Landis received a facsimile copy of the signed Rental Agreement between Enterprise Rental Cars and defendant Clarence Hart. (C. Ex. 19).

house. Continuing his investigation. Officer Murray contacted the Communication Center in an effort to obtain an address based on the telephone number provided to him by Enterprise Rental Cars. The Communication Center supplied Officer Murray with an address of 829 Jackson Street, Allentown, Lehigh County (C. Ex. 13; C. Ex. 14; C. Ex. 15; C. Ex. 16; C. Ex. 17; C. Ex. 17A). Officer Murray noted that defendant's residence, 829 Jackson Street, Allentown, is located across the street from where the subject purse had been discovered that morning (C. Ex. 8; C. ex. 9; C. Ex. 10; C. Ex. 11; C. Ex. 13; C. Ex. 14; C. Ex. 15; C. Ex. 16; C. Ex. 17; C. Ex. 17A). Additionally, Officer Murray observed a gray Pontiac sedan, bearing the subject license plate, parked to the rear of the Jackson Street building.

Assisting Officer Murray in the investigation, Detective Eric Landis viewed and obtained the video surveillance from the Liquor Store located at 1918 Allen Street, Allentown (C. Ex. 2). Detective Landis observed Ms. Benner in the liquor store (C. Ex. 2). He also observed on the video surveillance a black man with an orange hat exit the liquor store within one (1) minute of Ms. Benner's arrival[25] (C. Ex. 2).

A sealed warrant was obtained for defendant Clarence Hart's arrest. Detective Landis attempted to locate the

_____

25. A review of the video surveillance of the liquor store establishes that a black male with a bright orange hat was in the liquor store at 5:45 P.M. on November 28, 2008 (C. Ex. 23). This individual left the liquor store at approximately 5:46 P.M. (C. Ex. 23). Ms. Benner entered the same liquor store at approximately 5:47 P.M. (C. Ex. 23). Detective Landis identified the person in the video as Clarence Hart. Additionally, the person in the Liquor Store video had on the same clothes as the person in the McDonald's video, who indisputably was the defendant (C. Ex. 23).

defendant in order to effectuate the arrest. He went to 829 Jackson Street, Allentown, and spoke with the owner of the building. Detective Landis was informed that defendant Clarence Hart usually drives a tan suburban vehicle. On December 5, 2008, Chief Ron Manescu observed a tan Chevrolet Tahoe at the defendant's place of employment on Sumner Avenue. Chief Manescu witnessed the defendant go back and forth to the vehicle and therefore he ran the license plate on the Chevrolet Tahoe. The vehicle was registered to Gail Fields, the girlfriend of defendant Clarence Hart. Defendant Clarence Hart was arrested at this time.

The tan Chevrolet Tahoe had been in an accident and was not able to be driven. Specifically, the front passenger side wheel was severely damaged. Detective Landis and Detective Hackman went to Gail Fields' residence located on 16th Street, Allentown. Detective Landis informed Ms. Fields that her vehicle had been involved in an accident and he asked her to accompany him to headquarters. Ms. Fields agreed and was very cooperative. At headquarters, Detective Landis explained that her vehicle needed to be towed due to its condition and Ms. Fields was agreeable to this resolution.[26] Ms. Fields executed a Consent Search of Vehicle Form with regards to her Chevrolet Tahoe (C. Ex. 21). The contents of the form were explained to Ms. Fields prior to her executing same, and at no time was Detective Landis' demeanor threatening or coercive. In fact, the police were cordial and polite to Ms. Fields. Detective

---

26. Ms. Fields was interviewed at headquarters for approximately 40 minutes. This interview was recorded with the consent of Ms. Fields. At the conclusion of the interview, Detective Landis drove Ms. Fields back to her residence.

Landis and Detective Hackman were dressed in casual clothes and neither displayed a gun at any time. While it is true that the first time that Ms. Fields was informed of the detectives' belief that defendant Clarence Hart was involved in a robbery was in the interview room after she had executed the Consent Search of Vehicle Form, at no time did Ms. Fields request that her consent be revoked.

Ms. Fields' vehicle was searched later that day. Defendant's wallet was recovered from the vehicle. A rental agreement between Enterprise Rental Cars and Defendant Clarence Hart for a gray Pontiac sedan was located in the defendant's wallet (C. Ex. 22).

Viewing all the evidence and all reasonable inferences arising therefrom in the light most favorable to the commonwealth, it is clear that the evidence was sufficient to enable a finder of fact to conclude that all the elements of the offenses were established beyond a reasonable doubt. Indeed, at the conclusion of the jury trial, despite the lack of forensic evidence and a positive identification linking the defendant to the crimes, the jury had no doubt that the defendant robbed, burglarized (and conspired to do the same with the driver of the get-away vehicle) and assaulted Ms. Benner and stole her Vera Bradley purse on the night in question.

From the evidence recounted above, it is reasonable to have concluded that the defendant was the individual who robbed, burglarized and assaulted Ms. Benner, and conspired to do the same. Indeed, the defendant's image was captured at the liquor store within one (1) minute of Ms. Benner entering the premises. Similarly, the defendant

was seen on the McDonald's surveillance video purchasing small french fries at the time and date that was stamped on the McDonald's receipt that was located in Ms. Benner's recovered purse. Additionally, the license plate information that was noted by Mr. Fuller and Ms. Benner's grandson on the get-away vehicle belonged to a rental vehicle from the Enterprise Rental Cars fleet. The rental agreement reflected that Clarence Hart was the individual who rented the subject vehicle. Clarence Hart had a known address of 829 Jackson Street, Allentown, Lehigh County, which was located across the street from where the purse had been discovered. In light of this evidence, the defendant's challenge to the weight of the evidence must fail.

### D. *Motion to Suppress*

Next, the defendant contends that this court erred in denying the defendant's motion to suppress the items seized as a result of the search of the defendant's vehicle, in so far as the search was the product of coercion, and not a knowing, voluntary waiver. The defendant's contention that the officers did not have valid consent to search his girlfriend's Chevrolet Tahoe on December 5, 2008, lacks merit. To establish a valid consensual search, the commonwealth must first prove that the consent was given during a legal police interaction. *Commonwealth v. Strickier*, 563 Pa. 47, 57, 757 A.2d 884, 889 (2000). Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. *Id.* As articulated in *Commonwealth v. Acosta*, 815 A.2d 1078, 1083 (Pa. Super. 2003):

It is the commonwealth's burden to prove that a

defendant consented to a warrantless search. *Cleckley*, 558 Pa. at 520, 738 A.2d at 429 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Commonwealth v. Silo*, 480 Pa. 15, 389 A.2d 62 (1978)). To establish a voluntary consensual search, the commonwealth must prove 'that a consent is the product of an essentially free and unconstrained choice - not the result of duress or coercion, express or implied, or a will overborne - under the totality of the circumstances.' *Mack*, 568 Pa. at 334, 796 A.2d at 970 (quoting *Strickler*, 563 Pa. at 79, 757 A.2d at 901 (2000).

*Commonwealth v. Acosta*, 815 A.2d 1078, 1083 (Pa. Super. 2003). Various factors are considered in evaluating the voluntariness of a consent, including the following: (1) the use of coercion, duress, or deception; (2) the defendant's belief that no incriminating evidence will be found; (3) he defendant's education and intelligence; (4) the extent and level of the defendant's cooperation with the law enforcement personnel; (5) the defendant's custodial status; and (6) the defendant's knowledge of his right to refuse to consent. *Commonwealth v. Cleckley*, 558 Pa. 517, 521, 738 A.2d 427, 429 n.7 (1999); *Commonwealth v. Blasioli*, 454 Pa. Super. 207, 685 A.2d 151, 156 (1996), affirmed, 713 A.2d 1117 (Pa. 1998). Voluntariness is a question to be determined by the totality of the circumstances. *Cleckley*, 558 Pa. at 521, 738 A.2d at 429; See also *Commonwealth v. Grosso*, 448 Pa. Super. 552, 559, 672 A.2d 792, 795 (1996).

In the instant case, the Chevrolet Tahoe had been involved in an accident with substantial damage resulting

to the front passenger wheel and was not able to be driven. Consequently, on December 5, 2008, Detective Landis and Detective Hackman went to Gail Fields' residence located on 16th Street, Allentown. Detective Landis informed Ms. Fields that her vehicle had been involved in an accident and he asked her to come down to headquarters with him. Ms. Fields agreed and was very cooperative. At Headquarters, Detective Landis explained to Ms. Fields that her vehicle needed to be towed due to its condition. Ms. Fields was agreeable to this resolution. In fact, Ms. Fields executed a consent search of vehicle form with regards to her Chevrolet Tahoe. The contents of the form were explained to Ms. Fields prior to her signing, and at no time was Detective Landis' demeanor threatening or coercive. Indeed, the police were cordial and polite to Ms. Fields. Detective Landis and Detective Hackman were dressed in casual clothes and neither displayed a gun at any time. While it is true that the first time that Ms. Fields was informed of the detectives' belief that her boyfriend, Clarence Hart, was involved in a robbery was in the interview room after she had executed the consent search of vehicle form, at no time did Ms. Fields request that her consent be revoked.

Ms. Fields' vehicle was searched later that day. From the vehicle, defendant's wallet, cell phone paperwork pertaining to Ms. Fields and two (2) Keystone Medical identification cards were recovered. A rental agreement between Enterprise Rental Cars and Clarence Hart for a gray Pontiac sedan was located in the defendant's wallet.

Applying the facts of the within case to the above-mentioned factors, Gail Fields' consent to allow the officers

to search her vehicle was voluntary. Neither Detective Landis nor Detective Hackman employed coercive tactics to compel Ms. Fields to consent to the search of her vehicle. Consequently, Ms. Fields voluntarily, knowingly and intelligently executed a consent search of vehicle form which provided the detectives with a valid consent for the subject search. The record is void of evidence to suggest that the consent was a product of coercion.

### E. *Motion to Dismiss Counsel and Proceed Pro Se*

Next, this court contends that this court erred in denying the defendants' motions to dismiss counsel, as well as defendant's motion to proceed pro se. The procedural history involving this allegation is voluminous: On December 17, 2008, Robert Long, Esquire, was appointed to represent the defendant. On April 2, 2009, the defendant filed a pro se motion for change of counsel and appointment of new counsel. Thereafter, on April 14, 2009, a hearing was held in relation to that motion. On April 15, 2009, this court denied the defendant's request to have Robert Long, Esquire, removed as his attorney. Then, on June 1, 2009, the defendant filed another pro se motion for change of counsel. On June 17, 2009, after hearing, this court granted leave for attorney Long to withdraw as counsel, and appointed Eric K. Dowdle, Esquire, in his stead.[27]

Subsequently, on October 9, 2009, at the time of the

---

27. While this court granted the defendant's motion for change of counsel, this court made it abundantly clear that it was not suggesting that Robert Long, Esquire had acted inappropriately in any manner in his representation of the defendant. Rather, this court was basing its decision on the fact that the attorney-client relationship was irreparably damaged and this court feared that such a contentious relationship potentially could be harmful to the defendant's presentation of his defense.

evidentiary hearing being conducted relative to the defendant's omnibus pretrial motions, the defendant orally made a motion to have his counsel discharged from representing him. At the hearing, the defendant argued that attorney Dowdle was ineffective in his preparation for the hearing on defendant's omnibus pretrial motion. This argument formed the basis for his oral motion to have attorney Dowdle removed from his case. This court denied this motion because it found that attorney Dowdle had filed an omnibus pretrial motion in compliance with the directives of his client, both as to form and substance. Additionally, attorney Dowdle was present in court and prepared to proceed with the evidentiary hearing. Also, attorney Dowdle had secured the presence of the witness that the defendant desired to have available for the hearing. Based on the foregoing, the defendant's ineffectiveness assertion lacked merit and his oral motion was denied.

Thereafter, on December 4, 2009, the defendant filed yet another pro se motion for change of counsel. At the January 6, 2010 hearing, the defendant stated that he was dissatisfied with attorney Dowdle because attorney Dowdle failed to provide oral argument at the conclusion of the omnibus pretrial motion hearing. The defendant also expressed his dissatisfaction with attorney Dowdle's failure to submit a brief in support of the defendant's position after the evidentiary hearing on the defendant's omnibus pretrial motions. Additionally, the defendant accused attorney Dowdle of not zealously representing him at the omnibus pretrial motion hearing. This court found the defendant's assertions to lack foundation. Attorney

Dowdle conducted himself appropriately at the evidentiary hearing by questioning the witnesses and challenging the testimony. As a courtesy, this court afforded counsel for the commonwealth and defense counsel the opportunity to file a brief in support of their positions.[28] Both the attorney for the commonwealth and attorney Dowdle chose not to file a brief. Such action did not violate any duty, as attorney Dowdle is vested with the authority to make strategic decisions as to what is presented to the court. Consequently, this court denied the defendant's pro se motion for change of counsel.

Then, on January 29, 2010, the defendant filed a pro se motion for waiver of counsel. A hearing was conducted on this motion on February 12, 2010, in which the defendant stated that he felt "coerced" to waive his right to counsel. In particular, the defendant indicated that he was "under duress" to represent himself because the court would not appoint new counsel for him. Because the waiver was not voluntary, this court properly denied the defendant's pro se motion for waiver of counsel.[29]

Based on the foregoing, this court appropriately denied the defendants' numerous motions to dismiss counsel, as well as defendant's motion to proceed pro se. Defendant's appeal lacks merit in this regard.

---

28. This court based its decision on the *facts* presented at the time of the hearing on defendant's omnibus pretrial motion. A brief is *not* evidence.

29. At the time of trial, the defendant and attorney Dowdle communicated extremely well. The discord that existed prior to the trial vanished. Indeed, attorney Dowdle and the defendant conferred with each other, and the defendant participated actively in his defense and the presentation thereof.

### F. *Motion for Recusal*

Finally, defendant Clarence Hart argues that the undersigned judge erred in not granting the defendant's motion for recusal filed on December 18, 2009. At the time of the hearing on defendant's motion for recusal on January 6, 2010, the defendant alleged that the undersigned judge's prior rulings formed the basis for his motion for recusal. Specifically, the defendant stated that the unfavorable rulings issued from the bench indicated a bias on the part of the Judge.[30] Additionally, defendant Hart stated that he had filed a complaint with the Judiciary Misconduct Board against the undersigned, thereby creating a conflict of interest until final resolution of that issue. The defendant's argument is baseless.

Initially this court notes that the party who asserts that a trial judge must be disqualified bears the burden of producing evidence establishing bias, prejudice, or unfairness necessitating recusal. *Commonwealth v. Perry,* 468 Pa. 515, 364 A.2d 312 (1976); *Commonwealth v. Curtin,* 365 Pa. Super. 424, 430, 529 A.2d 1130, 1133 (1987). In general, a trial judge should recuse herself whenever she has any doubt as to her ability to preside impartially in a criminal case or whenever she believes her impartiality can be reasonably questioned. *Commonwealth v. Goodman,* 454 Pa. 358, 361, 311 A.2d 652, 654 (1973).

In the instant case, the undersigned ruled on the motions filed based solely on the evidence presented. This court

---

30. The defendant cited to this court's failure to grant his motions for change of counsel, as well as this court denial of the defendant's motion to suppress.

conveyed to the defendant that it had the ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The defendant failed to produce a scintilla of evidence establishing the necessity for recusal. Therefore, this court found that the defendant's recusal request was unwarranted and denied same.

In light of the foregoing, the defendant's appeal should be dismissed.