J-S23042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| GARY J. COKE | : | No. 183 MDA 2022 |

Appeal from the Order Entered January 6, 2022
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0002168-2021

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.:                    **FILED NOVEMBER 09, 2022**

The Commonwealth appeals from the order that granted Gary J. Coke's Omnibus Pretrial Motion to Suppress, which had the effect of suppressing "[a]ll evidence obtained from the unconstitutional *Terry* frisk of [Coke] and the illegal search of [his] vehicle[.]" Order, dated January 5, 2022. On appeal, the Commonwealth solely contends that the lower court erred in granting this motion because, in addition to Coke giving police officers consent to perform a search of his person and his automobile, those same officers acted with the requisite amount of probable cause and/or reasonable suspicion at all relevant points. We vacate the order granting suppression and remand for further proceedings.

Replicated in full from the suppression court:

_____

* Retired Senior Judge assigned to the Superior Court.

On March 17, 2021, Officer Scott Gibson (hereinafter "Officer Gibson") of the Swatara Township Police Department was in full uniform and parked in a fully marked K9 vehicle in the parking lot of Leeds Restaurant and Lounge on Eisenhower Boulevard when he received a call from Detective Day. Detective Day is a member of the Drug Task Force and stated that she was conducting surveillance in the parking lot of the Sleep In, which is caddy corner from Leeds Restaurant. She further informed Officer Gibson that she was watching an individual she knew as 'Gary Coke' (later identified as [d]efendant) who was driving a 2009 Lincoln MKS with dark tint. Detective Day observed someone "come to the vehicle and then leave in a short time."

A few minutes later, Officer Gibson saw [Coke's] vehicle leave the Sleep Inn parking lot and travel north on Eisenhower Boulevard. Officer Gibson followed the vehicle for a short period and then conducted a traffic stop for a tint violation because he could not see the driver through the window. He approached the vehicle on the passenger side, asked the driver to roll down the window and informed [Coke] that the stop was for a tint violation. However, Officer Gibson did not issue [Coke] a citation for the illegal tint, nor did he measure the level of tint on the vehicle.

Officer Gibson testified that he immediately smelled an odor of marijuana from inside the vehicle, but did not "make a big deal about it at that point." Based on the odor alone, Officer Gibson asked [Coke] to step out of the vehicle, and "hang out" with Detective Patrick Corkle (hereinafter "Detective Corkle") while he ran [Coke's] information. Officer Gibson testified that [Coke] was "not free to go, by any means" at that point.

In the thirty … seconds to a minute that it took Officer Gibson to run [Coke's] information, Detective Corkle had placed [Coke] in handcuffs. Officer Gibson testified that he was "kind of surprised [Coke] was in handcuffs already." Detective Corkle is also a member of the Drug Task Force and testified that he was conducting surveillance in plain clothes in an unmarked police vehicle. He further testified that he was listening to the radio traffic of a team conducting surveillance on [Coke] at the Sleep Inn. The Swatara Township Police Department has responded to a large amount of drug calls at the Sleep Inn, but it is not as prevalent as other hotels in the area, such as the Rodeway Inn, which shares a parking lot with the Sleep Inn. Detective Corkle overheard on the radio that Officer Gibson had stopped [Coke's]

vehicle and decided to head to the scene and assist.

As Detective Corkle approached the vehicle, he heard Officer Gibson ask [Coke] to step out of the vehicle. Officer Gibson advised Detective Corkle that he was going to run [Coke's] information and asked Detective Corkle to "watch" [Coke]. In the thirty … seconds to a minute that it took Officer Gibson to run [Coke's] information, Detective Corkle testified that he engaged [Coke] in a conversation, informed [Coke] that his activity at the Sleep Inn was suspicious and believed he was involved in drug activity ([Coke] denied any involvement); told [Coke] he was familiar with him and believed him to have narcotics on his person, that [Coke] denied it and said 'check me' so Detective Corkle patted down the outside of [Coke's] clothes with an open hand and felt what he immediately believed to be marijuana, placed [Coke] under arrest, and finally removed the marijuana, as well as a pill bottle, from [Coke's] pocket. Detective Corkle did not **Mirandize** [Coke] nor did he inform [Coke] that he was under arrest before he was handcuffed, or at any time thereafter.

Officer Gibson saw [Coke] in handcuffs when he returned to the vehicle and immediately **Mirandized** him. He testified that [Coke] was very cooperative and polite throughout the interaction. While handcuffed, Officer Gibson asked [Coke] for consent to search his vehicle, to which [Coke] granted. However, Detective Corkle testified that Officer Gibson first asked [Coke] if there were any other drugs in the vehicle, but could not recall whether Officer Gibson asked for consent to search or whether [Coke] said to "check his car." A search of [Coke's] vehicle revealed THC wax and money.

Suppression Court Opinion, dated 1/5/22, at 1-4 (footnotes and citations to the record omitted) (parentheticals in original).

After Coke's arrest, he was charged with various drug-related offenses, namely possession with intent to deliver. **See** 35 P.S. § 780-113(a)(30). Eventually, Coke filed a motion to suppress the evidence recovered from this interaction with police officers, asserting primarily that Detective Corkle had no legal basis to perform a frisk of his person pursuant to **Terry v. Ohio**. **See**

- 3 -

392 U.S. 1 (1968). In addition, Coke averred that, to the extent he consented to a body or vehicular search, such agreement was not voluntary. The resultant suppression hearing led to the court's conclusion that "the Commonwealth has failed to prove that the **Terry** frisk of [Coke] was lawful, and that [Coke] voluntarily consented to a search of his person and vehicle." Suppression Court Opinion, dated 1/5/22, at 11. The Commonwealth timely appealed from this determination.[1]

On appeal, the Commonwealth questions:

1. Whether the trial court erred in granting [Coke's] suppression motion where police possessed probable cause to initiate a traffic stop and secure the occupants of the vehicle, reasonable suspicion to continue to detain [Coke], valid consent to search [Coke's] person, and valid consent and probable cause to search [Coke's] vehicle?

Commonwealth's Brief, at 4.

When reviewing a Commonwealth appeal from an order granting a suppression motion,

[this Court] follow[s] a clearly defined standard of review and consider[s] only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of facts bind an appellate court if the record supports these findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

**Commonwealth v. Deck**, 954 A.2d 603, 606 (Pa. Super. 2008) (citation

---

[1] Although this appeal is interlocutory, the Commonwealth, in its notice of appeal, certified that the lower court's decision will terminate or substantially handicap the prosecution. **See** Pa.R.A.P. 311(d).

omitted).

The Commonwealth presents a tripartite argument, wherein it contends that there was: (1) probable cause to both initiate a traffic stop and secure Coke, as an occupant of the "seized" vehicle; (2) reasonable suspicion to continue to detain Coke; and (3) valid consent from Coke to search both his person and his vehicle, with there being probable cause, too, to search the vehicle. **See** Commonwealth's Brief, at 9.

Preliminarily, we note that Coke does not contest whether the initial traffic stop, related to the alleged dark window tint of his vehicle, **see** 75 Pa.C.S.A. § 4524(e), was predicated on probable cause. **See** Appellee's Brief, at 16 ("Officer Gibson had probable cause to initiate a stop and detain … Coke[.]"). To that point, based on the conceded legality of that stop, it was then permissible for Officer Gibson to order Coke out of his vehicle. **See Commonwealth v. Pratt**, 930 A.2d 561, 564 (Pa. Super. 2007) ("[F]ollowing a lawful traffic stop, an officer may order … the driver … of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot.").

However, it is immediately beyond this juncture where the Commonwealth and Coke disagree. The Commonwealth avers that after Officer Gibson obtained Coke's driver's license and departed a short distance to run Coke's information in his patrol vehicle, effectively leaving Detective Corkle and Coke alone together, Detective Corkle acted upon a specific suspicion when he proceeded to pat down Coke and resultantly discover

contraband. In particular, Detective Corkle's testimony established that he suspected, based on some level of prior knowledge, that Coke was involved in drug activity and, too, that Coke was seen in an area of hotels that were rife with drug transactions. *See* Commonwealth's Brief, at 12.

Even going beyond this purported reasonable suspicion to perform a pat down, the Commonwealth argues that Coke consented to a search of his person. Specifically, the conversation between Detective Corkle and Coke, while Coke was not under arrest, was conversational. After Detective Corkle indicated that Coke was believed to be involved with drugs, Coke freely offered permission to Detective Corkle to perform some sort of body search.

Conversely, Coke argues that there was no legally sufficient basis for Detective Corkle to pat him down, notwithstanding the invitational language he used to the Detective, and that Coke's agreeance to "check" him was the product of duress, given various aspects of the situation as it had unfolded,.

Pursuant to *Terry v. Ohio*, an identified police officer who "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," 392 U.S. 1, 30 (1968), is permitted to, when nothing else dispels this safety-based fear, "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id*. Such an action is known as a *Terry* frisk. Our Supreme Court has further clarified:

> [A] protective search cannot be justified under **Terry** unless the officer can articulate facts that establish an individualized, objective basis for perceiving a threat of armed violence. . . . [A]n individual's location, standing alone, does not provide sufficient grounds for a **Terry** search. . . . Furthermore, … courts cannot abandon the totality-of-the-circumstances test and rely exclusively upon the preconceived notion that certain types of criminals regularly carry weapons.

**Commonwealth v. Grahame**, 7 A.3d 810 (Pa. 2010) (internal citations and parenthetical omitted).

Based on his testimony, Detective Corkle knew that Coke's name had come up "several times for cocaine investigations." Suppression Hearing, 11/17/21, at 25. While the Detective had been told, at an undefined point, that Coke had prior convictions for drug activity, he "wasn't directly familiar" with Coke's criminal record. **Id**.

When Detective Corkle was present with Coke, he conveyed to Coke that his initial location, being at a particular hotel, and corresponding activity were both suspicious. **See id**., at 26. Accordingly, Detective Corkle made it known to Coke that he was suspected to be involved in drug activity. **See id**. Coke denied this allegation and stated to the Detective: "[y]ou can check me," **id.**, which then led to the search on the outside of his clothing. Even after the pat down had been performed, Detective Corkle remarked that Coke was "very cooperative" and his demeanor was "very calm" and "chatty." **Id**., at 28-29.

Later, Detective Corkle relayed that he had been concerned about weapons possibly being on Coke. **See id**., at 33. Of note, Detective Corkle stated that "anyone involved in drug activity, it's a high probability that they

carry a weapon." ***Id***.

Based on the record, we agree with the lower court that "Detective Corkle lacked the requisite individualized reasonable suspicion to conduct a ***Terry*** frisk." Suppression Court Opinion, dated 1/5/22, at 7. Of note, while Coke had been seen in a hotel area that had been the subject of other drug-related interactions with police officers, Coke evidenced no behavior, either in words or in action, that could reasonably be seen as a threat to Detective Corkle. In fact, he was cooperative throughout the entire interaction. Moreover, Detective Corkle did not state that he had seen any sort of suspicious bulge in Coke's clothing prior to the pat down.

Without anything discrete mentioned that would tie Coke to potentially having a weapon, Detective Corkle's supposition that Coke was armed did not go further than the insufficient "generalization [absent anything more] that firearms are commonly found in close proximity to illegal drugs." ***Grahame***, 7 A.3d at 401. In the absence of any particularized facts that could support an objectively reasonable belief that Coke possessed a weapon, Detective Corkle was not permitted to perform a ***Terry*** frisk on that basis.

To the extent that the Commonwealth argues, in the alternative, that Detective Corkle obtained Coke's consent prior to the pat down, therefore extinguishing any need to obtain reasonable suspicion, we find that further development is necessary.

We agree with the lower court that voluntary consent can act as an exception to the United States Constitution's Fourth Amendment's warrant

requirement. **See** Suppression Court Opinion, dated 1/5/22, at 7; **see also Commonwealth v. Acosta**, 815 A.2d 1078, 1083 (Pa. Super. 2003) (*en banc*) (remarking that the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution provide, in total, protections against unreasonable searches and seizures as well as a heightened level of personal privacy). However, consent must be unequivocal and specific. **See Acosta**, 815 A.2d at 1083 (citation omitted). Therefore, the Commonwealth must show that consent was given during a legal police interaction and, too, that it was the product of "an essentially free and unconstrained choice–not the result of duress or coercion, express or implied, or will overborne–under the totality of the circumstances." **Id**. (citation omitted). Voluntariness is "a question of fact[.]" **Commonwealth v. Hawkins**, 257 A.3d 1, 11 (Pa. Super. 2020).

The totality of the circumstances approach involves consideration of myriad factors. **See, e.g.**, **Commonwealth v. Cleckley**, 738 A.2d 427, 433 n.7 (Pa. 1999) (deeming the defendant's custodial status, police officer's use of duress or coercive tactics, the individual's knowledge of his right to refuse consent, the individual's education and intelligence to be instructive); **Commonwealth v. Kemp**, 961 A.2d 1247, 1261 (Pa. Super. 2008) (*en banc*) (outlining the **Commonwealth v. Strickler**, 757 A.2d 884 (Pa. 2000), factors, which include, e.g., (1) the presence of police excesses; (2) whether there was physical contact; (3) location of the interdiction; (4) whether the individual has been told he is free to leave; (5) police demeanor/manner of expression; and (6) the existence/character of the initial investigative

detention, with an emphasis on its degree of coerciveness); *Acosta*, 815 A.2d at 1085, 1087 (providing even more considerations as to voluntariness). While there is no *per se* rule that police officers must indicate that a subject is free not to consent to a search, *see Cleckley*, 738 A.2d at 528, that nondisclosure has been "deemed significant" in prior cases. *Acosta*, 815 A.2d at 1087 (citing to, *inter alia*, *Strickler*, *supra*).

As has been defined by this Court in a recent case and replicated in the suppression court's opinion:

> The Fourth Amendment analysis in consent cases entails a two-prong assessment: first, the constitutional validity of the citizen/police encounter giving rise to the consent and, second, the voluntariness of said consent. ...
>
> Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed that he was free to leave, the law characterizes a subsequent round of questioning by the officer as a mere encounter. . . . Nevertheless, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he is free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest. ... Where a consensual search has been preceded by an unlawful detention, the exclusionary rule requires suppression of the evidence.

*Commonwealth v. Mattis*, 252 A.3d 650, 654-55 (Pa. Super. 2021) (internal citations and quotation marks omitted).

The lower court found that Coke's interactions with Detective Corkle prior to the pat down were beyond that of a "mere encounter," and were the functional equivalent of an investigative detention. In reaching this conclusion, the court found that "in view of all surrounding circumstances, a reasonable

person would [not] have believed that he was free to leave." ***Commonwealth v. Williams***, 73 A.3d 609, 614 (Pa. Super. 2013) (imploring courts to apply "the totality-of-the-circumstances approach" to ascertain whether the subject's movement has been in some way restrained) (citations omitted); ***see also Commonwealth v. Cost***, 224 A.3d 641, 651 (Pa. 2020) ("[T]he retention by police of an identification card … will generally be a material and substantial escalating factor within the totality assessment.").

*Inter alia*, the court found that Officer Gibson retained Coke's driver's license and noted that, when Coke had been standing with Detective Corkle outside of his vehicle, "he was not free to go, by any means." Suppression Hearing, 11/17/21, at 15-16, The court additionally emphasized that, although Officer Gibson's vehicle was equipped with an operational dashboard camera, a video of the event, which could have provided further clarity, was not preserved. ***See id***., at 5, 10-11 (remarking that "[w]ithout the benefit of the dashboard camera footage, [the lower c]ourt [was] left to speculate what occurred in the sequence of events leading up to [Coke's] arrest[]").

Despite the suppression court's opinion having a heading titled "Consent," which is the legal question this case appears to hinge on, and containing a concluding sentence stating that the Commonwealth failed to prove voluntary consent, the suppression court has provided absolutely no analysis, relying on any of the factors identified, *supra*, into whether Coke freely consented to a search of his person. Even though Coke "was subjected

to an investigative detention when Officer Gibson asked [him] to 'hang out' with Detective Corkle," Suppression Court Opinion, dated 1/5/22, at 9, that fact does not inherently vitiate one's ability to consent to a search in that situation. Similarly, in tracking more of the suppression court's opinion where it stated that a reasonable person in Coke's position would not have felt free to leave, that determination, standing alone, does not completely eliminate the ability to consent to a pat down. Freedom of movement and consenting to a search are separate considerations, albeit the former is generally considered a factor in determining whether the latter was an unconstrained choice.

The court's conclusion that Coke's consent to search was unlawfully obtained because the Commonwealth "failed to prove that Officer Gibson and Detective Corkle possessed reasonable suspicion to believe that [Coke] was engaged in criminal activity," *id*., at 10, seems wholly unrelated to a consent analysis, unless the court is implicitly stating that Coke was, at that point in time, unlawfully detained. If, in fact, the court found there had been an unlawful detention, that finding should have been unequivocal and any evidence obtained correspondingly excluded.

Conversely, assuming there to have been a lawful investigative detention while Detective Corkle was conversing with Coke and Officer Gibson possessed Coke's driver's license, we instruct the court to determine whether, under the totality of the circumstances, Coke's utterance indicating that Detective Corkle could "check" him was consensual and therefore an exception

to the Fourth Amendment's warrant requirement. Given that the voluntariness of consent is a question of fact, we remand for the court to make explicit findings as to whether Coke freely gave consent to Detective Corkle prior to the pat down.

As the subsequent search of Coke's vehicle was predicated, in large part, on the contraband recovered from the pat down, any ruling as to the validity of the vehicular search would be premature at this juncture.

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2022